Filed 8/27/18

# IN THE SUPREME COURT OF CALIFORNIA

WILLIAM JAE KIM et al.,      )
                                   )
        Plaintiffs and Appellants,    )
                                   )             S232754
        v.                       )
                                   )      Ct.App. 2/7 B247672
TOYOTA MOTOR CORPORATION et al.,  )
                                 )      Los Angeles County
        Defendants and Respondents.   )  Super. Ct. No. VC059206
_____ )

Plaintiff William Jae Kim (Kim) was severely injured after he lost control of his Toyota Tundra pickup truck and drove off an embankment. Together with his wife, Kim brought this strict products liability suit against defendant Toyota Motor Corporation and related entities (collectively, "Toyota"), claiming that the pickup truck was defective because its standard configuration did not include a particular safety feature, known as vehicle stability control ("VSC"), they claim would have prevented the accident. At trial, the jury heard evidence that no vehicle manufacturer at the time included VSC as standard equipment in pickup trucks. The jury ultimately found in Toyota's favor and the Court of Appeal affirmed.

The question before us is whether, as the courts below held, this kind of evidence of industry custom and practice may be introduced in a strict products liability action. The answer depends on the purpose for which the evidence is

1

SEE CONCURRING OPINION

offered.  Evidence that a manufacturer's design conforms with industry custom and practice is not relevant, and therefore not admissible, to show that the manufacturer acted reasonably in adopting a challenged design and therefore cannot be held liable; under strict products liability law, a product may contain precisely the same safety features as other products on the market and still be defective.  But even though evidence of industry custom and practice cannot be dispositive of the issue, it may nevertheless be relevant to the strict products liability inquiry, including the jury's evaluation of whether the product is as safely designed as it should be, considering the feasibility and cost of alternative designs. Because the evidence in this case was properly admitted for that limited purpose, we affirm the judgment of the Court of Appeal.

## I.

On a rainy day in April 2010, Kim was driving his 2005 Toyota Tundra pickup truck through the mountains on the Angeles Forest Highway.  Kim was descending on a right-hand curve at approximately 45 to 50 miles per hour when, he says, a vehicle coming from the opposite direction crossed into his lane.  Kim attempted a sequence of three steering maneuvers—a right steer, a left steer, and a right steer—that resulted in Kim losing control of the vehicle.  The truck ran off the road and down the side of a cliff before it came to rest.  Kim suffered serious neck and spinal cord injuries that rendered him a quadriplegic.

Kim, together with his wife, Hee Joon Kim, sued Toyota for his injuries, asserting causes of action for strict products liability and loss of consortium.[1]  The Kims alleged that VSC[2] would have prevented Kim's accident.  In 2005, Toyota

---

[1]     The Kims also initially alleged negligence and breach of warranty, but voluntarily dismissed those causes of action before trial.
[2]     VSC is also known as electronic stability control.  For the sake of consistency, this opinion uses the term VSC.

2

offered VSC—then a relatively new technology—on the Tundra as part of an optional package including various enhanced safety features. The Kims alleged that VSC should instead have been made part of the Tundra's standard equipment and that the omission was a defect in the Tundra's design.

Before trial, the Kims filed a motion in limine asking the court to preclude "any argument, evidence or testimony comparing the Toyota Tundra to competitor's vehicles and designs, and any evidence or argument that [Toyota's] design choices were not defective . . . because they were equivalent or superior to those of its competitors." During a hearing on the motion, however, counsel for the Kims appeared to back away from the position that such evidence was categorically inadmissible. Counsel instead took the view that evidence that Toyota's competitors did not make VSC standard equipment on their pickup trucks would be admissible to explain why Toyota decided not to make VSC standard equipment on the 2005 Toyota Tundra. According to counsel, the Kims were not, in fact, seeking exclusion of this evidence, but rather a limiting instruction advising that this evidence was being offered only "to explain why [Toyota] did or didn't do what they did under the risk benefit doctrine," and not to make out a defense to liability. The trial court denied the motion in limine but informed the Kims that they were "welcome to prepare a limiting instruction that [they would] like," which would then be "litigate[d] at the appropriate time."[3]

At trial, the Kims argued that VSC would have prevented Kim's accident and that the benefits of including VSC on the 2005 Toyota Tundra outweighed the

---

[3] The Kims also filed a motion in limine seeking to preclude "any argument, evidence or testimony that compliance with Federal Motor Vehicle Safety Standards (FMVSS) either (a) satisfies the manufacturer's obligations in the manufacture or design of the subject vehicle, (b) demonstrates the subject vehicle was safe for its intended use, or (c) demonstrates a lack of defect in the subject vehicle . . . ." The trial court also denied this motion in limine. The Kims neither appealed the denial to the Court of Appeal nor sought our review of this issue.

3

risks of its omission. The Kims presented expert testimony that VSC helps drivers maintain control of their vehicle by sensing when the vehicle turns more or less than driver's steering wheel input—either causing the vehicle's rear end to swing out and the rear tires to slip or, alternatively, causing the vehicle to drift and the front tires to slip—and applying a brake to either a front or back tire to counteract the rotation and help the driver straighten out the vehicle. Two of the Kims' expert witnesses opined that VSC would have prevented Kim from losing control of his truck. A third expert witness estimated that the incremental cost to Toyota of adding VSC to the 2005 Toyota Tundra would have been approximately $300 to $350 per vehicle.

The Kims also called Sandy Lobenstein, Toyota's product planning manager, as an adverse witness. From Lobenstein they elicited testimony about why Toyota decided against making VSC standard equipment on the 2005 Toyota Tundra. Lobenstein testified that Toyota had included VSC on Lexus models in the 1990s and made VSC standard equipment in some of its sport-utility vehicles ("SUVs") in 2001 and 2004. Lobenstein also testified that one of the Toyota engineers had recommended that VSC be made standard equipment for the 2005 Toyota Tundra. But Lobenstein explained that Toyota was trying to "produce a vehicle that met the customer's needs based on price, based on future availability, and at the time we felt like optional VSC was the best decision." Lobenstein noted that Toyota's market research indicated that pickup truck consumers were price sensitive and uninterested in VSC, and that none of Toyota's competitors were offering VSC as either standard or optional equipment on their 2005 pickup truck models. The Kims relied on Lobenstein's testimony to argue that Toyota knew that pickup trucks have similar loss-of-control risks to SUVs, and therefore required comparable safety equipment, but Toyota knowingly disregarded the

4

safety risk because it saw no competitive advantage in including VSC as standard equipment on pickup trucks.

On cross-examination of Lobenstein, Toyota also elicited testimony about Toyota's decision to make VSC optional equipment on the 2005 Toyota Tundra. Lobenstein reiterated his earlier testimony that no other manufacturer offered VSC as standard equipment for their 2005 pickup truck models and the 2005 Toyota Tundra was the first pickup truck to offer VSC as optional equipment. He explained that the decision to offer VSC as optional equipment was consistent with the industry practice of a "phase in," whereby a manufacturer first offers expensive, emerging technology as an option rather than as standard equipment.

In its case, Toyota argued that the 2005 Toyota Tundra was already safe without VSC and that VSC would not have averted Kim's accident. Toyota presented expert testimony that: (1) Kim caused the accident by driving above the speed limit in poor driving conditions; (2) VSC could not have averted the accident because VSC helps to steer the vehicle in the direction the steering wheel is aimed, and Kim's left steer would have aimed the car in the direction of the embankment; and (3) the 2005 Toyota Tundra was already equipped with features designed to prevent vehicle control problems.

The jury was instructed on the so-called risk-benefit theory of strict products liability, under which the jury must determine whether the product's design creates preventable danger that is excessive in relation to the advantages of the design. (See *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 (*Barker*).) The jury found that the 2005 Toyota Tundra did not have a design defect, and the trial court entered a judgment in favor of Toyota. The Kims moved for a new trial on multiple grounds, including the trial court's denial of their motion in limine to exclude evidence of industry custom and practice. The trial court denied the motion.

5

On appeal, the Kims again challenged the trial court's denial of their motion in limine to exclude evidence of industry custom and practice. The Court of Appeal rejected the challenge. In so doing, it identified tension between a line of appellate decisions beginning with *Titus v. Bethlehem Steel Corp.* (1979) 91 Cal.App.3d 372, 381–382 (*Titus*), which have stated that such evidence is irrelevant and inadmissible in a strict products liability action, and *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 425–426 (*Howard*), which held that evidence that the product complied with trade association industry standards was an appropriate factor to consider in the risk-benefit analysis. The Court of Appeal adopted what it termed a "middle ground" position under which evidence of industry custom and practice may be relevant and admissible depending "on the nature of the evidence and the purpose for which the party seeking its admission offers the evidence." Here, the Court of Appeal concluded that the challenged evidence was relevant to both the Kims' and Toyota's theories of how the jury should weigh the risks and benefits of the Toyota Tundra's design, and it therefore affirmed the trial court's denial of the motion in limine. The Court of Appeal rejected the Kims' other claims of error, including their objection to the admission of specific evidence concerning industry custom and practice, and affirmed the judgment.[4]

---

[4] The Court of Appeal also affirmed the trial court's rejection of a proposed jury instruction that would have advised the jury that it was "no defense" that the Tundra's design "met the standards of the motor vehicle industry at the time the Tundra was produced, or that Toyota's competitors sold vehicles that were no safer than the Tundra, or had the same design defects, or lacked the same safety equipment." The Court of Appeal concluded this proposed instruction, as worded, was "misleading, argumentative, and incomplete." The Kims have again attempted to defend their proposed jury instruction in their briefing to this court. Although the concurring opinion does not disagree with the Court of Appeal's characterization of the Kims' proposed instruction, it concludes that the trial court "erred in declining to provide *any* limiting instruction." (Conc. opn. of Dato, J.,

6

To resolve the tension among the Court of Appeal decisions, we granted review limited to the following question: Did the trial court commit reversible error in admitting, as relevant to the risk-benefit test for design defect, evidence of industry custom and practice related to the alleged defect?

## II.

## A.

In tort law, a manufacturer is liable "if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 (*Soule*).) The manufacturer may be held strictly liable for such injuries without regard to whether the manufacturer acted negligently in designing or manufacturing the product. The doctrine of strict products liability "focusses not on the conduct of the manufacturer but on the product itself, and holds the manufacturer liable if the product was defective." (*Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1056.)

The existence of a design defect may be established according to one of two alternative tests. (*Barker*, *supra*, 20 Cal.3d at pp. 429–430.) First, under the so-called consumer expectations test, a design is defective "if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." (*Id.* at p. 429.) Second, under the risk-benefit test articulated in *Barker*, a design is defective "if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." (*Id.* at p. 430.) The risk-benefit test requires the plaintiff to first

---

*post*, at pp. 5–6.) This issue falls outside the scope of our grant of review and we do not address it.

7

"demonstrate[] that the product's design proximately caused his injury." (*Id.* at p. 432.) If the plaintiff makes this initial showing, the defendant must then "establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Ibid.*) In *Barker*, we set out a nonexhaustive list of factors (now generally referred to as the "*Barker* factors") relevant to the analysis: "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Id.* at p. 431.) This test, in short, subjects a manufacturer to liability when "the design is not as safe as it should be—while stopping short of making the manufacturer an insurer for all injuries which may result from the use of its product." (*Id.* at p. 432.)

The issue before us concerns the admissibility of evidence of industry custom and practice when a plaintiff alleges a design defect under the risk-benefit test. By "industry custom and practice," we refer to the use of the challenged design within the relevant industry—"what *is* done"—as opposed to so-called " 'state of the art' " evidence, which concerns "what *can* be done" under present technological capacity. (*Carter v. Massey-Ferguson, Inc.* (5th Cir. 1983) 716 F.2d 344, 347 [distinguishing evidence of "industry custom" from evidence of the " 'state of the art' "]; see *McLaughlin v. Sikorsky Aircraft* (1983) 148 Cal.App.3d 203, 209–210 (*McLaughlin*) [drawing same distinction]; see also Owen, *Proof of Product Defect* (2004) 93 Ky. L.J. 1, 7, fn. 42 (*Proof of Product Defect*) ["Industry 'custom,' meaning prevailing use of technology, differs from the higher standard of 'state of the art,' meaning the best technology reasonably available at the time."].) Our analysis begins from the premise that, "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.)

Relevant evidence is that which "ha[s] any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) The critical question is whether evidence of industry custom and practice has a tendency to prove or disprove any fact that is of consequence to the proper weighing of the risks and benefits of the challenged design.

A series of Court of Appeal opinions have taken the view that such evidence is always irrelevant, and thus inadmissible, to the risk-benefit analysis. This line of authority begins with *Titus*, *supra*, 91 Cal.App.3d at page 374, a strict products liability action brought by a young boy who was injured while playing on an oil well pumping unit. The plaintiff alleged that the manufacturer's failure to include a safety guard on the unit constituted a design defect. (*Id.* at p. 376.) The jury found no defect. (*Id.* at p. 377.) On appeal, the court considered whether it was reversible error for the trial court to refuse to provide a jury instruction defining "defective product." (*Ibid.*) The Court of Appeal concluded that it was, noting that the jury had heard considerable evidence that "it was custom and practice in the industry that manufacturers offered security guards as optional equipment." (*Id.* at p. 378.) Citing the pre-*Barker* case of *Foglio v. Western Auto Supply* (1976) 56 Cal.App.3d 470, the court concluded that the jury should not have heard this evidence because "custom and usage is not a defense to a cause of action based on strict liability." (*Titus*, at p. 378.) In the absence of a definition of "defect," the court concluded that "it is quite probable that [the jury] believed the pump was not defective without safety features if it was customary to sell the product without such equipment." (*Ibid.*) The court further ruled that on retrial, "evidence on custom and usage as it pertains to the optional sale of the safeguards" would be inadmissible. (*Id.* at p. 382.)

In *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757 (*Grimshaw*), the Court of Appeal held that compliance with standard industry practice is not an

appropriate factor for consideration in the risk-benefit analysis. The plaintiffs in *Grimshaw*, who had been severely injured when their Ford Pinto burst into flames after being hit from behind by another vehicle, claimed that the Pinto's fuel system was defectively designed. (*Id.* at pp. 773–774.) The jury returned a verdict in favor of the plaintiffs, and Ford appealed, arguing, inter alia, that the trial court erred by rejecting its request to instruct the jury with the risk-benefit test. (*Id.* at pp. 801–802.) The proposed instruction listed as a " 'relevant factor[]' " for the jury's consideration " 'the extent to which its [the Ford Pinto's] design and manufacture matched the average quality of other automobiles and the extent to which its design and manufacture deviated from the norm for automobiles designed and manufactured at the same point in time.' " (*Id.* at p. 803.) The Court of Appeal upheld the trial court's refusal to give this instruction. (*Id.* at pp. 802–803.) Relying on *Titus* and *Foglio*, the court explained that "[i]n a strict products liability case, industry custom or usage is irrelevant to the issue of defect." (*Id.* at p. 803.) The court observed that *Barker* had not listed industry custom and practice in its enumeration of relevant factors under the risk-benefit test. (*Ibid.*) What is more, the court found that *Barker*'s reasoning implies that such evidence is an "inappropriate consideration[]" insofar as *Barker* distinguished strict liability claims from negligence claims on the ground that the former directs the jury's attention to " 'the condition of the product itself, and not to the reasonableness of the manufacturer's conduct.' " (*Ibid.*, quoting *Barker*, *supra*, 20 Cal.3d at p. 434.)

Finally, in *Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 545 (*Buell-Wilson*), the Court of Appeal affirmed the trial court's exclusion of statistical evidence comparing the rollover rate of the defendant's vehicle to other vehicles because "the *Barker* risk/benefit analysis does not allow admission of such [industry custom] evidence . . . ." Other Courts of Appeal have assumed, without deciding, that this states the governing rule. (See *McLaughlin*, *supra*, 148

10

Cal.App.3d at p. 210 [recognizing "rule, not involved in this case, that evidence of industry custom and usage is irrelevant in a products liability case," but ruling that evidence that design comported with the state of the art is admissible as relevant to the risk-benefit balancing].)

By contrast, the Court of Appeal in *Howard*, *supra*, 203 Cal.App.4th at page 426, held that at least some evidence of industry custom and practice is relevant under the risk-benefit test and therefore admissible. In that case, the plaintiff was injured when he slipped in a hotel bathtub. (*Id.* at p. 411.) He sued, alleging the bathtub was defectively designed because its antislip coating did not comply with " 'applicable standards.' " (*Id.* at p. 412, italics omitted.) The manufacturer countered that the coating complied with technical standards promulgated by trade associations. (*Ibid.*) In affirming the grant of summary judgment to the bathtub manufacturer on this claim, the court held that the bathtub manufacturer's "reliance on industry standards is a factor to be legitimately considered . . . ." (*Id.* at p. 425.) The Court of Appeal in *Howard* explained: "When the plaintiff alleges strict product liability/design defect, any evidence of compliance with industry standards, while not a complete defense, is not 'irrelevant,' but instead properly should be taken into account through expert testimony as part of the design defect balancing process." (*Id.* at p. 426.) Therefore, "expert evidence about compliance with industry standards can be considered on the issue of defective design, in light of all other relevant circumstances, even if such compliance is not a complete defense." (*Ibid.*)

In upholding the trial court's denial of the motion in limine in this case, the Court of Appeal staked out what it described as a "middle ground," under which "evidence of industry custom and practice may be relevant and, in the discretion of the trial court, admissible in a strict products liability action, depending on the nature of the evidence and the purpose for which the party seeking its admission

11

offers the evidence."  The Court of Appeal reasoned that "[i]ndustry custom may reflect legitimate, independent research and practical experience regarding the appropriate balance of product safety, cost, and functionality," and the possibility that industry custom might not reflect such considerations or strike the appropriate balance "does not make the evidence inadmissible."  The Court of Appeal also noted that "[e]vidence of industry custom also may be relevant to the feasibility of a safer alternative design, and to the consequences that would result from an alternative design, two of the *Barker* risk-benefit factors."  In sum, evidence of the manufacturer's compliance or noncompliance with industry custom and practice "may be relevant . . . in determining whether a product embodies excessive preventable danger, which is the ultimate question under the risk-benefit test."

## B.

What the Court of Appeal described as a "middle ground" between these lines of authority is perhaps more accurately described as an extension of *Howard*. But the ground the Court of Appeal staked out is, in all events, solid.

The central insight of the *Titus*/*Grimshaw* line of cases is that compliance or noncompliance with industry custom and practice is not an element of strict products liability.  Strict products liability, unlike negligence doctrine, focuses on the nature of the product, and not the nature of the manufacturer's conduct. (*Barker*, *supra*, 20 Cal.3d at p. 434.)  This means that the fact "the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances" does not preclude a finding of design defect for which the manufacturer may be held strictly liable.  (*Ibid.*)  The issue, therefore, is not whether the manufacturer complied with a standard of care, as measured by prevailing industry standards, but instead whether "there is something 'wrong' with a product's design—either

12

because the product fails to meet ordinary consumer expectations as to safety or because, on balance, the design is not as safe as it should be . . . ." (*Id*. at p. 432.)

Without calling this basic insight into question, the court in *Howard* correctly observed that evidence of industry custom and practice sometimes does shed light not just on the reasonableness of the manufacturer's conduct in designing a product, but on the adequacy of the design itself. *Barker*'s risk-benefit test calls on juries to consider whether a design is safe enough, given "the relative complexity of design decisions and the trade-offs that are frequently required in the adoption of alternative designs." (*Barker*, *supra*, 20 Cal.3d at p. 418.) Depending on the circumstances, evidence of other manufacturers' design decisions may aid the jury's understanding of these complexities and trade-offs, and thus may provide some assistance in determining whether the manufacturer has balanced the relevant considerations correctly. (See *Howard*, *supra*, 203 Cal.App.4th at p. 426; cf. *Soule*, *supra*, 8 Cal.4th at p. 567, fn. 4 [under *Barker*, "juries receive expert advice, apply clear guidelines, and decide accordingly whether the product's design is an acceptable compromise of competing considerations"].)

Notably, the Kims do not dispute that "[e]vidence of technical standards . . . may legitimately be cited as evidence of industry research or experience in balancing safety, feasibility, cost and functionality," at least depending on the quality of the research and testing underlying development of the standards. They also concede that what they call "industry experience" evidence is relevant to the inquiry—that is, evidence that "competitors tried to produce a safer alternative design but the design malfunctioned, imposed unsustainable costs, or made the product less efficient." They acknowledge that such evidence would be relevant to the jury's consideration of the feasibility of a safer alternative design and the

adverse consequences of adopting an alternative design, two of the factors laid out in *Barker*.

The Kims' objection instead centers on what they refer to as "[t]rue industry custom evidence": "evidence that 'nobody does it,' that 'every body does it,' or that the defendant's product is no more dangerous than others on the market." It is that sort of evidence that cases like *Titus* and *Grimshaw* held inadmissible, they argue, and for good reason, because it is "indistinguishable from standard-of-care evidence." Such evidence, the Kims reason, "guarantees that jurors will be distracted from the details of feasibility, cost and relative safety to a 'reasonable manufacturer' standard, allowing defendants to successfully argue that the product must be safe because 'everybody does it.' "

We agree with the Court of Appeal that this category of evidence may, depending on the circumstances, be admissible. It is not clear why we would cordon off this category of evidence from, for example, the category of industry standards promulgated by trade associations, which the Kims regard as acceptable. "After all," as the Court of Appeal noted, "trade associations consist of manufacturers and other businesses whose conduct comprises the industry custom and practice." And more to the point, such industry custom and practice evidence may be relevant in a strict liability design defect case—even if not dispositive— for much the same reason as industry standards evidence: because it illuminates "the relative complexity of design decisions and the trade-offs that are frequently required in the adoption of alternative designs." (*Barker*, *supra*, 20 Cal.3d at p. 418.) Perhaps the best illustration of this point is the fact that the Kims themselves introduced precisely this sort of evidence at trial in an effort to bolster their argument that Toyota designed the Tundra without standard VSC because it valued profits over safety. Although Toyota's actual reasons for designing the Tundra as it did are not dispositive of the ultimate question whether, objectively

14

speaking, the Tundra was designed as safely as it should have been, the Kims do not (and could not) dispute that the evidence was relevant to the jury's consideration of the issue.

In what may be a more common scenario, plaintiffs might legitimately seek to inform the jury that the defendant has not implemented a safety feature that is standard in the industry. Here, the Kims made this sort of claim when they introduced evidence that all major auto manufacturers, including Toyota, equipped SUVs with standard VSC, and asked the jury to infer from relevant similarities between SUVs and pickup trucks that VSC should have been made standard on the 2005 Tundra as well. Again, such evidence could not be dispositive; perhaps other manufacturers have chosen, for whatever reason, to incur unnecessary costs for miniscule safety gains, or perhaps the unique design of the defendant's product makes the industry-standard feature redundant. But plaintiffs would surely be within their rights in asking the jury to make the comparison and to draw reasonable inferences from the widespread adoption of a safety feature missing from the defendant's product.

By the same token, a defendant might point to the fact that a particular safety feature is not standard in the industry as some evidence of whether the challenged design embodies excess preventable danger under *Barker*. The probative value of such evidence may well vary from case to case, and in some cases the relationship between industry design practices and consideration of the *Barker* factors may be sufficiently attenuated to warrant exclusion of the evidence. But in cases such as this one, competing manufacturers' independent design decisions may reflect their own research or experience in balancing safety, cost, and functionality, and thus shed some light on the appropriate balance of safety risks and benefits in much the same manner as evidence of industry-wide technical

15

standards.[5]  Again, such evidence cannot be dispositive; perhaps the entire

industry has "unduly lagged" in adopting feasible safety technologies.  (*The T. J.

Hooper* (2d Cir. 1932) 60 F.2d 737, 740.)  But although counsel may argue that

industry standards "can and should be more stringent," "[e]vidence that all product

designers in the industry balance the competing factors in a particular way clearly

is relevant to the issue before the jury."  (*Back v. Wickes Corp.* (1978) 375 Mass.

633, 642–643.)

Some of the older cases raised concerns that permitting juries to hear such

evidence would subvert the distinction between strict liability and negligence.

(E.g., *Buell-Wilson*, *supra*, 141 Cal.App.4th at p. 545; *Grimshaw*, *supra*, 119

Cal.App.3d at p. 803.)  But as *Barker* recognizes, the risk-benefit balancing does

---

[5]     In so concluding, we join the majority of states that have permitted the admission of evidence of industry custom and practice as relevant to, but not dispositive of, the existence of design defect under risk-benefit balancing tests similar to ours.  (See *Proof of Product Defect*, *supra*, 93 Ky. L.J. at pp. 9–10; see also, e.g., *Back v. Wickes Corp.*, *supra*, 375 Mass. at pp. 642–643; Wash. Rev. Code Ann. § 7.72.050(1) ["Evidence of custom in the product seller's industry, technological feasibility or that the product was or was not, in compliance with nongovernmental standards or with legislative regulatory standards or administrative regulatory standards, whether relating to design, construction or performance of the product or to warnings or instructions as to its use may be considered by the trier of fact."]; but see, e.g., *Lewis v. Coffing Hoist Div., Duff-Norton* (1987) 515 Pa. 334, 343 [concluding that industry custom and practice evidence is irrelevant and therefore inadmissible in a strict products liability action].)

Our conclusion is also consistent with the general approach taken in the Restatement, whose commentary states:  "When a defendant demonstrates that its product design was the safest in use at the time of sale, it may be difficult for the plaintiff to prove that an alternative design could have been practically adopted. The defendant is thus allowed to introduce evidence with regard to industry practice that bears on whether an alternative design was practicable.  Industry practice may also be relevant to whether the omission of an alternative design rendered the product not reasonably safe.  While such evidence is admissible, it is not necessarily dispositive."  (Rest.3d Torts, Products Liability, § 2, com. d, p. 20.)

16

in some ways resemble a traditional negligence inquiry, and "most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard—e.g., the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case . . . ." (*Barker*, *supra*, 20 Cal.3d at p. 431; see *id.* at p. 434 ["It is true, of course, that in many cases proof that a product is defective in design may also demonstrate that the manufacturer was negligent in choosing such a design."]; cf. *Pike v. Frank G. Hough Co.* (1970) 2 Cal.3d 465, 470 [explaining the test for negligent design is "a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm"].) The pertinent difference between the two inquiries, *Barker* explained, is that strict liability marshals this evidence to illuminate the condition of the product, rather than the reasonableness of the manufacturer's conduct. (*Barker*, *supra*, 20 Cal.3d at p. 434.) And as noted, evidence of industry custom and practice can shed some light on the condition of the challenged product, as opposed to the reasonableness of the manufacturer's conduct. To admit industry custom and practice evidence for this limited purpose pays proper respect to the distinct doctrine of strict products liability.

We are unpersuaded that permitting a defendant to introduce relevant evidence of industry custom and practice will, as the Kims argue, impair strict liability's goal of "reliev[ing] an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action." (*Barker*, *supra*, 20 Cal.3d at p. 431.) To ease the burden on plaintiffs in a strict liability action, in *Barker* we assigned to the defendant the burden of demonstrating that the benefits of the challenged design outweigh its risks. (*Id.* at p. 432.) Permitting a defendant to introduce evidence of industry custom and practice does not alter the nature of

17

that burden, nor does such evidence automatically discharge the burden. In any event, the rule is a two-way street: a plaintiff can similarly rely on industry custom and practice to bolster its own argument, as the Kims sought to do at trial in this case.

We stress that while industry custom and practice evidence is not categorically inadmissible, neither is it categorically admissible; its admissibility will depend on application of the ordinary rules of evidence in the circumstances of the case. The Court of Appeal opinion provides appropriate guidance for conducting this inquiry, and we adopt the court's approach. First, the party seeking admission of such evidence must establish its relevance to at least one of the elements of the risk-benefit test, either causation or the *Barker* factors. (Evid. Code, § 351.) The evidence is relevant to the *Barker* inquiry if it sheds light on whether, objectively speaking, the product was designed as safely as it should have been, given "the complexity of, and trade-offs implicit in, the design process." (*Barker*, *supra*, 20 Cal.3d p. 432.) Whether the evidence serves this purpose depends on whether, under the circumstances of the case, it is reasonable to conclude that other manufacturers' choices do, as the Court of Appeal put it, "reflect legitimate, independent research and practical experience regarding the appropriate balance of product safety, cost, and functionality." If the proponent of the evidence establishes a sufficient basis for drawing such a conclusion, the evidence is admissible, even though one side or the other may argue it is entitled to little weight because industry participants have weighed the relevant considerations incorrectly. The evidence may not, however, be introduced simply for the purpose of showing the manufacturer was acting no worse than its competitors.

Next, even if the party seeking admission of such evidence meets this threshold burden, the trial court retains the discretion to exclude this evidence if

18

"its probative value is substantially outweighed by the probability that its admission will" either "necessitate undue consumption of time" or "create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) And finally, if the party opposing admission of this evidence makes a timely request, the trial court must issue a jury instruction that explains how this evidence may and may not be considered under the risk-benefit test. (Evid. Code, § 355 ["When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."].)[6]

### III.

Because industry custom and practice evidence can shed light on the appropriate inquiry under the risk-benefit test, the trial court was correct to deny the Kims' motion in limine seeking to exclude all evidence of industry custom and practice in this case. The court was likewise correct to admit the challenged evidence at trial. As noted, the Kims themselves introduced what they refer to as "[t]rue industry custom evidence": the fact that none of Toyota's competitors offered VSC as either standard or optional equipment on the 2005 models of their pickup trucks. Lobenstein testified to this point during both direct examination by the Kims and cross-examination by Toyota. The Kims contended that evidence of industry custom was relevant to the risk-benefit analysis because it demonstrated Toyota's actual weighing of the risks and benefits of the 2005 Toyota Tundra's design. The Kims argued to the jury that because Toyota knew that pickup trucks

---

**6** We disapprove *Titus v. Bethlehem Steel Corp*. (1979) 91 Cal.App.3d 372, *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, and *Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, insofar as they are inconsistent with the views expressed in this opinion.

19

have similar loss-of-control risks to SUVs, which were equipped with VSC as standard equipment, Toyota knowingly disregarded these loss-of-control risks in the pickup trucks because Toyota saw no competitive advantage in including VSC as standard equipment in their pickup trucks. The Kims therefore used the evidence of industry custom to establish that Toyota's decision not to make VSC standard equipment was unrelated to legitimate design considerations.

The Kims argue that the trial court erred in admitting this evidence. But having elicited the evidence themselves, the Kims are hardly in a position to object to its admission. (E.g., *Gjurich v. Fieg* (1913) 164 Cal. 429, 433; see also *People v. Williams* (1988) 44 Cal.3d 883, 912 ["It is axiomatic that a party who himself offers inadmissible evidence is estopped to assert error in regard thereto."].) In any event, as noted, the evidence was relevant, and therefore admissible in the Kims' case, insofar as it illuminated the decisionmaking process that resulted in the Tundra's design.

On cross-examination, Toyota elicited the same information from Lobenstein, as well as testimony regarding the industry practice of phasing new safety technologies into vehicles on the market. The Kims did not object to this line of questioning, and even if they had, the questioning was not objectionable: In response to questions raised by the Kims concerning Toyota's decisionmaking process, Toyota elicited additional evidence to explain how Toyota decides whether and when to implement emerging safety technologies. In so doing, it shed light on "the relative complexity of design decisions and the trade-offs that are frequently required in the adoption of alternative designs." (*Barker*, *supra*, 20 Cal.3d at p. 418.) We agree with the Court of Appeal that even if the Kims had not first put Toyota's decisionmaking process at issue, "testimony about how new safety technologies evolve and are phased in to vehicles in general, first as an

20

option and then as standard equipment, is relevant to the risk-benefit analysis . . ." and thus admissible.

Toyota also argues that the challenged evidence was admissible to shed light on the safety of its design, absent standard VSC. Toyota argues in particular that the jury was entitled to consider that the Kims' theory that the 2005 Toyota Tundra contained a design defect "meant that every 2005 pickup was defective." And indeed, Toyota asked the jury to do just that, arguing in closing argument that "[n]ot a single pickup on the market in model year 2005 or '6 had standard VSC. And if the position of the plaintiffs is that every vehicle or every pickup that didn't have VSC in 2005 was defective, then we sure have a lot of ticking time bombs out there."

The Court of Appeal criticized this theory, calling it "a prime example" of when industry custom and practice would not be relevant. A manufacturer's compliance with industry custom, the court explained, "does not tend to prove the product is not dangerous: All manufacturers may be producing an unsafe product." The premise is correct, but the conclusion is somewhat overstated. The Court of Appeal was, of course, right to note that a manufacturer's compliance with industry custom does not, without more, *prove* that a product is not dangerous. But as explained above, evidence of industry custom and practice may, in some cases, illuminate whether the product embodies excess preventable danger, given the trade-offs between competing design choices. Here, other evidence before the jury revealed the role that safety considerations play in the development of new vehicle designs in the automotive industry. The challenged industry practice evidence was admissible to shed light on the safety of the Tundra's design, absent standard VSC.

Once again, whether a manufacturer's product is as safe as or safer than any product on the market is not the question in a strict products liability case. But a

21

jury may, in appropriate cases, consider such evidence, just as it may consider whether the manufacturer has complied with industry technical standards, in evaluating whether, on balance, the design is defective.

## IV.

We affirm the judgment of the Court of Appeal.


**KRUGER, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**

**CONCURRING OPINION BY DATO, J.**

The answer you receive often depends on how you ask the question. Here, the majority opinion broadly frames the issue before the court as whether industry custom-and-practice evidence may be introduced in a strict products liability action. The answer, we learn, "depends on the purpose for which the evidence is offered." (Maj. opn. *ante*, at pp. 1−2.) As a statement of principle, this conclusion is unassailable, if a bit opaque. The devil is in the details, and the critical question becomes for what purposes is such evidence admissible, and for what purposes is it not?

Even before this court's seminal design defect decision in *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413 (*Barker*), the central question presented by this appeal was consistently characterized in narrower terms: Is evidence of *compliance with* industry custom and practice admissible in a strict products liability action *when offered by the defendant to show that the product was not defective in design*? And until relatively recently, the consistent answer from the Courts of Appeal to this narrower question was, "No." Since the pre-*Barker* decision in *Foglio v. Western Auto Supply* (1976) 56 Cal.App.3d 470, 477, California has followed a uniform and easily understood general rule: Industry custom-and-practice evidence is typically inadmissible in a design

1

defect products liability action when offered by a defendant to show that the product was not defective.  (See *Titus v. Bethlehem Steel Corp.* (1979) 91 Cal.App.3d 372, 381–382; *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 802–803; *Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 545.)  There is nothing wrong with this general rule.  As the majority opinion acknowledges, the proper focus of a design defect case is the condition of the product, not the reasonableness of the manufacturer's conduct.  (*Barker*, *supra*, 20 Cal.3d at p. 434.)  The fact that "everyone else is doing it" the same way may suggest that the manufacturer's behavior was in some sense reasonable, but it says nothing about whether "the risk of danger inherent in the challenged [product] design outweighs the benefits of such design." (*Id.* at p. 430.)  What "everyone else is doing" is not relevant to whether a product can be designed better, and it invites jurors to inadvertently conflate the condition of the product with the behavior of the manufacturer.

A

Based in part on the broad phrasing of the question, the majority opinion cautiously retreats from what was heretofore a largely consistent general rule.  In markedly qualified language we are instructed that now, industry custom-and-practice evidence offered by a defendant in a design defect case "*may, depending on the circumstances,* be admissible."  (Maj. opn. *ante*, at p. 14, italics added.)  "In *some* cases," we are told, "evidence of industry custom and practice can aid the jury's understanding of [the] complexities and trade-offs" inherent in product design decisions "and thus *may* provide *some* assistance in determining whether the manufacturer has balanced the relevant considerations correctly."  (Maj. opn. *ante*, at p. 13, italics added.)  Which cases?

2

The ones where "competing manufacturers' independent design decisions [i.e., custom-and-practice evidence] *may* reflect their own research or experience in balancing safety, cost, and functionality, and thus shed *some* light on the appropriate balance of safety risks and benefits . . . ." (Maj. opn. *ante*, at p. 15, italics added; see also maj. opn. *ante*, at p. 21.)

The majority opinion appears to endorse admission of a defendant's industry custom-and-practice evidence as a proxy for the foundational risks and benefits that a manufacturer *should* be evaluating in making product design decisions. That is a little like permitting evidence that an allegedly defective product received a J.D. Power award or the Good Housekeeping Seal of Approval—without anyone testifying about the criteria for that particular honor—because awards of this type *may* reflect a reasonable balancing of safety risks and benefits. Jurors should not be left to guess.

Evidence of the foundational risks and benefits is always relevant in a products liability case alleging design defect based on *Barker*'s risk-benefit analysis, where the burden is on the defendant manufacturer to prove that "the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker*, *supra*, 20 Cal.3d at p. 432.) But without the underlying analysis, a manufacturer's decision to produce a product in a particular way based on a particular design is merely a conclusion. Only *if* a manufacturer's design decision is based on an appropriate balancing of risks and benefits

3

does the conclusion have some relevance to the defendant's burden.[1]  It is the *basis* for the design decision that the jury must analyze.  To admit the conclusion (the industry custom-and-practice evidence) before the foundational evidence establishing that the appropriate risks and benefits were balanced would be pure speculation.

B

The majority opinion acknowledges this cart-before-the-horse problem when it warns that industry custom-and-practice evidence is not "categorically admissible." (Maj. opn. *ante*, at p. 18.)  In deciding if the evidence is admissible, trial court judges will be charged with determining "whether, under the circumstances of the case, it is reasonable to conclude that other manufacturers' choices do, as the Court of Appeal put it, 'reflect legitimate, independent research and practical experience regarding the appropriate balance of product safety, cost, and functionality.' "  (Maj. opn. *ante*, at p. 18.)  In other words, unless the defendant can establish that the other manufacturers' design choices actually represented a balancing of the appropriate factors, the industry

---

**1**    It is no answer to cite the virtue of a "two-way street" in suggesting that defendants should be allowed to introduce evidence of compliance with industry custom and practice because plaintiffs can similarly offer evidence of noncompliance.  (Maj. opn. *ante*, at p. 18; see also *id.* at p. 15.)  As the majority opinion elsewhere acknowledges in a different context (maj. opn. *ante*, at p. 19), the same evidence may be admissible for one purpose but inadmissible for another.  (See Evid. Code, § 355 [evidence may be admissible as to one party or for one purpose but inadmissible as to another party or for another purpose].)  Evidence of *noncompliance* with custom and practice is admissible to show the technological and practical feasibility of an alternative design, whereas evidence of *compliance* cannot prove a negative—that the design was *not* defective.

4

custom-and-practice evidence is not relevant to any disputed issue and does not come in. Trial judges are thus charged with an important gatekeeping role.

If the trial court ultimately concludes that the proffered design decisions of other manufacturers actually represented a balancing of the appropriate risks and benefits such that the evidence is admissible, the jury should be instructed on how the evidence *cannot* be used. In substance, jurors should be told that in determining whether the product is defective in design, the burden is on the defendant to prove that the benefits of the challenged design outweigh the risks. Attempting to meet this burden, the defendant has introduced evidence of how other manufacturers designed similar products. This evidence has been received for the limited purpose of evaluating whether the relevant risks and benefits were appropriately balanced. A product can still be defective in design even if the manufacturer acted no differently than any other reasonable manufacturer, and you cannot consider the conduct of other manufacturers for the purpose of showing there was no design defect.

C

In the case before us, the evidence of industry custom and practice was offered in the first instance by the plaintiffs, who disavowed any objection. I agree that under these circumstances, the trial court did not err in admitting such evidence. (Maj. opn. *ante*, at pp. 19–20.) But, as the majority opinion suggests (maj. opn. *ante*, at p. 19), the jury should have been given a limiting instruction. Plaintiffs proposed a series of special jury instructions that would have highlighted the limited relevance of such evidence. (Maj. opn. *ante*, at p. 3.) Without indicating that the trial court was obligated to accept the

5

particular language proposed by plaintiffs, I would hold that the court erred in declining to provide *any* limiting instruction.

For several reasons, however, I am not persuaded it is reasonably probable that a limiting instruction in this case would have resulted in a more favorable verdict for plaintiffs. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574, quoting *People v. Watson* (1956) 46 Cal.2d 818, 835.) First, the custom-and-practice evidence was largely elicited by plaintiffs to show that competitive advantage led to Toyota's decision to offer vehicle stability control solely as an optional safety feature. Second, after the trial court declined plaintiffs' proposed special instructions, referring to them as "all argument," plaintiffs' counsel failed to identify during closing argument the specific limited purpose for which custom-and-practice evidence could be considered. Third, although it was mentioned in Toyota's closing argument, industry custom and practice was not defense counsel's principal focus. Rather, the vast majority of closing argument on both sides focused on causation, suggesting that a proper limiting instruction was unlikely to result in a different outcome for plaintiffs.

Because the instructional error was harmless, I concur with today's affirmance of the Court of Appeal's judgment.


**DATO, J.**<sup>*</sup>

**I CONCUR:**

**LIU, J.**

---

* Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Kim v. Toyota Motor Corporation

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 243 Cal.App.4th 1366
**Rehearing Granted**

_____

**Opinion No.** S232754
**Date Filed:** August 27, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Raul A. Sahagun

_____

**Counsel:**

Law Offices of Ian Herzog, Herzog, Yuhas, Ehrlich & Ardell, Ian Herzog; Thomas F. Yuhas and Evan D. Marshall for Plaintiffs and Appellants.

RoganLehrman, Patrick Rogan, Daniel R. Villegas; Bowman and Brooke, David P. Stone; Bingham McCutchen, Morgan, Lewis & Bockius, Robert A. Brundage and Nicolette L. Young for Defendants and Respondents.

Horvitz & Levy, Lisa Perrochet, John A. Taylor, Jr., and Emily V. Cuatto for Alliance of Automobile Manufacturers as Amicus Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand; Erika C. Frank and Heather L. Wallace for California Chamber of Commerce and the Civil Justice Association of California as Amici Curiae on behalf of Defendants and Respondents.

Dykema Gossett, John M. Thomas and Ashley R. Fickel for The Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

Haynes and Boone, Mary-Christine Sungaila and Martin M. Ellison for International Association of Defense Counsel as Amicus Curiae on behalf of Defendants and Respondents.

K&L Gates, Edward P. Sangster and J. Nicholas Ranjan for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ian Herzog
Herzog, Yuhas, Ehrlich & Ardell
11400 West Olympic Boulevard, Suite 1150
Los Angeles, CA  90064
(310) 458-6660

Robert A. Brundage
Morgan, Lewis & Bockius
One Market, Spear Street Tower
San Francisco, CA  94105-1596
(415) 442-1000