**[J-1-2023] [OAJC: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| MICHAEL AND MELISSA SULLIVAN, H/W | : | No. 18 EAP 2022 |
|---|---|---|
| | : | |
| | : | Appeal from the Judgment of |
| v. | : | Superior Court entered on April 15, |
| | : | 2021 at No. 3086 EDA 2019 |
| | : | (reargument denied June 23, 2021), |
| WERNER COMPANY AND LOWE'S | : | affirming the Judgment entered on |
| COMPANIES, INC., AND MIDDLETOWN | : | November 19, 2019 in the Court of |
| TOWNSHIP LOWE'S STORE #1572 | : | Common Pleas, Philadelphia |
| | : | County, Civil Division at No. |
| | : | 161003086 |
| APPEAL OF:  WERNER COMPANY AND | : | |
| LOWE'S COMPANIES, INC. | : | ARGUED:  March 8, 2023 |

## CONCURRING OPINION

**JUSTICE DONOHUE**                              **DECIDED:  December 22, 2023**

I concur in the result reached in the Opinion Announcing the Judgment of the Court ("OAJC").  Based on the record in this case developed on the Sullivans' Motion in Limine to Preclude Introduction of Evidence of Compliance with Industry and Government Standards and Werner Company's and Lowe's Companies' ("Manufacturers") response thereto, the trial court did not abuse its discretion by disallowing the evidence.  In my view, the complicated legal issue presented in this appeal is unfortunately not resolvable because of the undeveloped evidentiary record and undirected advocacy in the trial court.

I am in agreement with many of the principles advanced by the OAJC, including that post-*Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), Pennsylvania remains fully committed to the Restatement (Second) of Torts § 402A for adjudication of strict liability claims; that such liability is divorced from the consideration of fault on the part of defendants; and that evidence that a defendant conformed its conduct to that of others in its industry in designing its product is irrelevant in determining whether, in a design defect case, a product is unreasonably dangerous for purposes of strict liability under Section

402A. It is on this last principle that the OAJC rests to conclude that evidence of industry and governmental standards is inadmissible. I am not fully convinced that this principle applies to one of the Manufacturers' arguments in favor of its admissibility.

As I understand it, in the context of this design defect case, Manufacturers' argument in support of admissibility of industry (ANSI)[1] and/or government (OSHA)[2] standards to establish lack of a defect in the design of its product is more nuanced. They submit that these standards establish a design that, apparently by definition, is not unreasonably dangerous (i.e., the design proves that the product is not defective). *See* Manufacturers' Brief, at 31. Taking this argument to its logical conclusion, it would not matter that no other manufacturer in the industry utilized the same design. According to the Manufacturers, producing a product that is designed pursuant to the industry or government standard makes evidence of the standard relevant to the question of whether the product is defective.

Accepting the Manufacturers' argument as workable for the purpose of examining the record in this case, there are two interrelated evidentiary deficits in the record that support the trial court's conclusion supporting a finding that these standards are inadmissible in this design defect case.

First, the Manufacturers' overarching argument before the trial court was that evidence that its product was designed in compliance with industry standards[3] is probative of whether the product is defective. *See* Defendants' Response in Opposition

---

[1] The American National Standards Institute ("ANSI").

[2] The Occupational Safety and Health Administration ("OSHA").

[3] While the motion in limine addressed the preclusion of both ANSI and OSHA standards, the focus of the arguments was on ANSI standards and so, I will also refer to those standards. However, my view of the deficits in the record apply equally to the attempted introduction of both standards.

to Plaintiffs' Motion in Limine to Preclude Any Mention of Government or Industry Standards, 4/22/2019; Memorandum of Law in Support of Response, 4/22/2019. This broad offer to explain the relevancy of the standards is disconnected from and not helpful to the jury's determination because the jury was instructed to consider a variety of factors in determining whether the product at issue was unreasonably dangerous. While the motion in limine was decided prior to the trial court's formulation of the actual points for charge under the risk-utility test, the range of factors that a jury would be instructed to consider were well known – the Wade Factors,[4] the Barker Factors,[5] and the safe choice,

---

[4] The Wade factors include:

(1) The usefulness and desirability of the product – its utility to the user and to the public as a whole.

(2) The safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Tincher*, 104 A.3d at 389-90 (quoting J. Wade, "On the Nature of Strict Tort Liability for Products," 44 MISS. L.J. 825, 837-38 (1973)).

[5] The Barker factors include:

(continued…)

Pennsylvania Suggested Standard Jury Instructions.[6] The Manufacturers did not attempt to establish the relevance of the applicable industry standards to any of the factors previously identified as relevant to the jury's determination that a product is unreasonably dangerous.

This shortcoming gives rise to the second deficiency in the Manufacturers' argument in opposition to the motion in limine: the record is devoid of any information about what ANSI standards are, how they are developed, or what their purpose,

---

(1) The gravity of danger posed by the challenged design.

(2) The likelihood that such danger would occur.

(3) The mechanical feasibility of a safer alternative design.

(4) The financial cost of an improved design.

(5) The adverse consequences to the product and to the consumer that would have resulted from an alternative design.

*Barker v. Lull Engineering Co.*, 573 P.2d 443, 454 (Cal. 1978).

[6] The suggested Pennsylvania jury instructions provides in relevant part:

…

To decide whether the product is defective under [the risk-utility test] you may consider the following factors:

(1) the seriousness of the potential harm resulting from the use of the product;

(2) the likelihood that the harm would occur;

(3) the feasibility of an alternative safer design at the time of the manufacture or sale of the product;

(4) the cost of an alternative design; and/or

(5) the disadvantages of an alternative design.

Pa. S.S.J.I. (Civ), § 16.20 Determination of Design Defect (2020).

application or interpretation is. In other words, are any of the various factors to be considered by the jury taken into account in the process of developing the standards.

From the outset, I was struck by the omission from the record of the actual ANSI or OSHA standard sought to be admitted by the Manufacturers.[7] As the proponent of the admission of the evidence, the Manufacturers had the burden of establishing its relevance. Instead, the Manufacturers assumed that merely invoking the acronym "ANSI" sufficiently apprised the trial court of the relevance of the evidence. Although one would not know it from the record in this case, the development, interpretation and application of ANSI standards are complicated.

While nothing in this record sheds light on the process, the District Court for Minnesota recently decided a case involving a claim based on an alleged violation of Minnesota's version of the Lanham Act and provided a detailed explanation of the developmental process and application of the ANSI standards. In *Little Giant Ladder Systems v. Tricam Industries, Inc.*, 2022 WL 325969 (D. Minn. Feb. 3, 2022), Little Giant sued Tricam, a competitor manufacturer of multi-position ladders, for falsely claiming that its ladder complied with ANSI standards, specifically the standard for minimum width of rungs on a ladder – ANSI A14.2 § 6.7.5. The district court engaged in a detailed analysis of the evidence, all of which was presented by these competing manufacturers in the ladder industry. Although it is not my intention to exhaustively recount the evidence or the district court's analysis, some of its findings of fact shed light on relevancy

---

[7] The Manufacturers' expert submitted a report that identified ANSI A10.8 — 2001 Scaffold Safety Requirements as the applicable ANSI standard and OSHA 1926 as the applicable standard for use in construction. Neither standard was attached to the report. *See* Knox Expert Report, 11/13/2018, at 32.

considerations important to a decision on the admissibility of ANSI standards in a strict liability design defect case.[8]

For example, the production of the ANSI standards was funded by the American Ladder Institute ("ALI") which is comprised of ladder manufacturers and suppliers. The standards were prepared under the supervision of a committee composed of members from three interest groups: 1) fabrication-related members (such as manufacturers and trade associations); 2) users of ladders (representing interests of customers and individuals employed by companies using ladders); and 3) other general interest members (like insurance companies, specialists and others who do not fall into the other categories). There can be no more than 1/3 representation on the committee from any interest group. This committee serves as the consensus body for the A14 standards. If the committee approves a standard, it is relayed to the ANSI organization for public comment. Committee approval of the standard does not necessarily imply that all committee members voted for its approval.

The purpose of ANSI A14.2 is "to provide reasonable safety for life, limb and property" and to provide a set of performance and dimensional requirements against which a product may be compared. It is not the purpose of the standard to specify all of the details of construction of portable metal ladders. Determining whether a ladder complies with ANSI standards involves a "self-policed" or "honor system;" i.e., individual manufacturers are responsible for their own testing to determine if they properly comply with ANSI standards. Moreover, Section 2.3 of ANSI A14.2 provides that in view of the

---

[8] My reference to the evidence in this case is purely to illustrate the complicated nature of the development of ANSI standards and the nuances in their interpretation and application. I note, however, that the Manufacturers' expert in this appeal, Erick H. Knox, Ph.D., P.E., cites to his participation in the development of ANSI ASC A14.2 as a basis for his expertise in the climbing industry, in which scaffolding manufacturers are included. *See* Knox Expert Report, 11/13/2018, at 3; N.T., 5/2/2019, at 185-88.

many different kinds of ladders and the many different conditions under which they are used, in determining compliance, the standard should be liberally construed considering the rationale. Finally, Section 5 of ANSI A14.2 explains that the standard is based on current designs and materials of construction.[9]

The case before us on appeal is devoid of any of the evidence necessary for the trial court to determine whether the ANSI standard applicable to the scaffold at issue was relevant to any of the factors to be considered by the jury in determining whether the product was unreasonably dangerous. The evidence adduced in the *Little Giant* deceptive trade practices case demonstrates that baldly stating that a product complied with ANSI standards is meaningless to a court tasked with determining the relevancy of the evidence. In this case, we do not know what was taken into account in developing the applicable standards or whether a liberal interpretation of the standard was recommended in the standard and, if so, whether it was applied. Although Manufacturers' expert proposed to testify that the scaffold "is compliant with ANSI … ,"[10] we cannot know who certified that fact — the Manufacturers or a third party? More importantly, was the applicable ANSI standard based on current design and materials in existence at the time of its development? If so, is the standard nothing more than an imprimatur on industry custom and practice and thus evidence of conforming to the conduct of others in the industry,[11] i.e., evidence of due care?

---

[9] The *Little Giant* court found this to be important in concluding that ANSI A 14.2 § 6.7.5 "was not intended on its adoption to render non-compliant an existing category of ladders produced by manufacturers with representation on the committee." *Little Giant*, 2022 WL 325969 at *16.

[10] *See* Knox Expert Report, 11/13/2018, at 29.

[11] The Dissent relies heavily on *Kim v. Toyota Motor Corp.*, 424 P.3d 290 (Cal. 2018), to support the admissibility of the ANSI standards in this case. *Kim* involved custom and usage in the industry, not ANSI standards. Custom and usage in the industry is pure "due
(continued…)

Any decision on the admissibility of industry or governmental standards in a design defect products liability case requires a developed record containing evidence establishing the relevance of the standard to a factor or factors that a jury must consider in reaching its liability verdict. Here, the trial court did not have that record and thus, the trial court did not err in excluding the evidence.

Moreover, while the trial court needed evidence concerning the development, application and interpretation of the ANSI standard at issue in this case to determine relevancy, if deemed admissible, the jury would be entitled to have much of the same evidence to determine what weight should be given to evidence that the product was designed to comply with the standard. A trial court would be within its exercise of discretion to exclude the evidence if it concluded that a sub-trial on the weight to be given to ANSI standards would confuse the jury and distort the focus from the product at issue to the machinations involved with the development, application, and interpretation of ANSI standards. This would be particularly true in a case like this one, where the design elements of the scaffold were simple; a platform fit into a track with the platform secured by a moveable latch on top of the platform.

Given the lack of a record supporting the admissibility of industry standards, the trial court did not err in excluding the evidence. Thus, I concur in the result reached in the OAJC.

---

care" evidence. The *Kim* Court relied on the Third Restatement and the fact that the majority of other states permit the admission of industry custom and practice evidence. *Kim*, 424 P.3d at 299, n.5. Conversely, this Court proclaimed in *Tincher* that Pennsylvania was not adopting the Third Restatement. *Tincher*, 104 A.3d at 399. Although *Tincher* is not the model of clarity on the post-*Azzarello v. Black Bros. Co.*, 391 A.2d 1020 (Pa. 1978), strict products liability world, it was perfectly clear in its rejection of the Third Restatement, including its broad endorsement of the admissibility of industry standards evidence in design defect cases as probative of the reasonableness of a manufacturer's design choice. In my view, if industry design standards have any role in design defect cases in Pennsylvania, they must be probative of something other than the defendant following others in the industry.