Filed 6/24/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| ARIEL DE JESUS ORTIZ et al., | C100034 |
| Plaintiffs and Appellants, | (Super. Ct. No. 21CV00759) |
| v. | |
| DAIMLER TRUCK NORTH AMERICA LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Butte County, Tamara L. Mosbarger, Judge. Reversed.

Complex Appellate Litigation Group, Michael von Loewenfeldt, Jocelyn Sperling; Walkup, Melodia, Kelly & Schoenberger, Michael A. Kelly and Andrew McDevitt for Plaintiffs and Appellants.

Polsinelli, David K. Schultz, J. Alan Warfield; Nelson Mullins Riley & Scarborough, Philip R. Cosgrove and Ryan E. Cosgrove for Defendant and Respondent.

Plaintiffs' mother was killed when a commercial truck traveling over 55 miles per hour rear-ended her car at a red light. Plaintiffs afterward sued the truck manufacturer, Daimler Trucks North America LLC (Daimler Trucks). Raising design defect and negligent design claims, they alleged that Daimler Trucks should be held liable for their mother's death because it failed to equip the truck with a collision avoidance system, called Detroit Assurance 4.0, that would have prevented this fatal accident. That system warns drivers when it detects a collision risk with a stationary object, including stopped traffic, and can stop the truck on its own when the driver fails to act. Daimler Trucks included Detroit Assurance 4.0 in some, but not all, of its trucks when it built the truck here.

We consider on appeal the trial court's ruling, on summary judgment, that plaintiffs' claims failed as a matter of law. The trial court based its ruling on two issues: proximate cause and duty of care. But we find neither issue supported the court's decision. Starting with proximate cause, the trial court alluded to two potential causes of the accident: the truck's allegedly defective design in omitting Detroit Assurance 4.0, and the truck driver's failure to brake to avoid stopped traffic. The court then indicated that it found the driver, and not the allegedly defective design, to be the proximate cause of the mother's death. But a single injury can have multiple proximate causes. And deciding who should be found a proximate cause of an injury is typically a question of fact for the jury, not a question of law to be resolved on summary judgment. In this case, plaintiffs do not dispute that the truck driver was a proximate cause of their mother's death. But they allege that the truck's defective design was a proximate cause too. And considering their evidence—including evidence showing Detroit Assurance 4.0 serves to prevent these very types of accidents—we conclude that proximate cause should have remained a question for the jury, as is ordinarily the case.

Turning to duty, plaintiffs assert that manufacturers have a general duty to install reasonable safety devices. Daimler Trucks does not disagree. But it argues (and the trial

2

court appeared to agree) that an exception to this duty should exist for a certain category of safety devices—namely, collision avoidance systems. We find differently. Endorsing the trial court's rule would mean that manufacturers would have no duty to install these safety features, even if they were undeniably inexpensive, feasible, and effective at preventing accidents and saving lives. Rather than find manufacturers never have a duty to install collision avoidance systems, no matter the underlying facts, we find it best to retain a duty of care in this context. That is not to say that commercial truck manufacturers have a duty to install collision avoidance systems in every case, as Daimler Trucks fears. It is to say only that they must exercise due care when choosing whether to install these systems. Whether Daimler Trucks breached that duty here is an issue outside the scope of this appeal. Finding none of Daimler Trucks' asserted grounds for summary judgment persuasive, we will reverse the trial court's judgment against plaintiffs.

BACKGROUND

I

*Fatal Truck Accidents and Collision Mitigation Systems*

Large commercial trucks play a major role in fatal multi-vehicle accidents. Several considerations suggest why, according to one of plaintiffs' experts. These trucks are far heavier, and generally stiffer, than the average vehicle—resulting in their delivering far greater forces in an accident than the average vehicle. They are also more difficult to stop and maneuver to avoid a collision. And their drivers drive longer hours than an average driver, creating more opportunities for collisions and a greater risk of driver fatigue. Federal authorities estimate that over 5,000 people are killed each year in collisions involving large trucks.

The commercial truck industry has developed several safety features to prevent or mitigate these collisions. Two involve forward collision warnings and automatic emergency braking. Describing these safety features in 2015, the National Highway

3

Traffic Safety Administration (NHTSA)[1] wrote: These "systems use forward-looking sensors, typically radars and/or cameras, to detect vehicles in the roadway. When a rear-end crash is imminent, the [forward collision warning] system warns the driver of the threat. If the driver takes no action, such as braking or steering, or if the driver does brake but not enough to avoid the crash, a [crash imminent braking] or [automatic emergency braking] system may automatically apply or supplement the brakes to avoid or mitigate the rear-end crash." Noting that these systems "have the potential to save lives by preventing or reducing the severity of rear-end crashes," NHTSA found it appropriate in 2015 to study these technologies further and to consider requiring these technologies on certain heavy vehicles. (Federal Motor Vehicle Safety Standards; Automatic Emergency Braking, 80 Fed.Reg. 62487 (Oct. 16, 2015).)

Around the same time, the National Transportation Safety Board (NTSB)[2] wrote 30 vehicle manufacturers, including Daimler Trucks, about these safety systems. It recommended that Daimler Trucks "[i]nstall forward collision avoidance systems that include, at a minimum, a forward collision warning component, as standard equipment on all new vehicles." It also recommended that Daimler Trucks install systems meeting NHTSA's performance standards for automatic emergency braking once those standards are established. NTSB noted that these recommendations "are designed to prevent accidents and save lives."

Two years later, in a 2017-2018 report, NTSB further endorsed implementation of these technologies. It wrote: "Humans make mistakes, even in transportation.

---

[1] NHTSA is a federal agency within the Department of Transportation that, among other things, writes and enforces safety standards for motor vehicles. (49 C.F.R. §§ 1.94(b), 501.2 (2025).)

[2] NTSB is an independent federal agency responsible for, among other things, investigating highway accidents, determining their cause, and making recommendations to protect against future accidents. (49 U.S.C. §§ 1131, 1135.)

Transportation operators must always walk a demanding line of alertness and vigilance, but collision avoidance technologies can provide a lifesaving safety net. Technologies such as collision warning and autonomous emergency braking in highway vehicles . . . will result in fewer accidents, fewer injuries, and fewer lives lost. These technologies are available today. They should be implemented today."

## II

### *Daimler Trucks and Detroit Assurance 4.0*

Daimler Trucks manufactures commercial trucks. One of its trucks is called Freightliner Cascadia (Cascadia). The Cascadia is a commercial truck that can weigh up to 80,000 pounds when pulling a loaded trailer. To give some context, the average passenger car weighs 4,000 pounds. The Cascadia's heavy size matters in an accident. Because it can weigh 20 times as much as the average passenger car, it can deliver 20 times the kinetic energy of an average passenger car in an accident. To put it another way, when a car is rear-ended by a Cascadia weighing 80,000 pounds, it is like being hit by 20 passenger cars—all at once.

Since 2009, Daimler Trucks has offered collision avoidance systems on its vehicles. In 2015, it began offering a collision avoidance system called Detroit Assurance 2.0—which includes both forwarded collision warning and automatic emergency braking—as an optional feature in its trucks. Later, in January 2017, it began offering a more advanced forward collision warning and automatic emergency braking system called Detroit Assurance 4.0—though, still, only as an optional feature.

Detroit Assurance 4.0 can track up to 40 objects at once, up to 825 feet in front of the truck, and refreshes its speed, distance, and time calculations 200 times per second. To prevent collisions with stationary objects, including stopped traffic, Detroit Assurance 4.0 will first initiate visible and audible alarms. If the driver fails to respond, it will then initiate further visible and audible alarms and pulse the brakes. And if the driver still fails to respond, it will then autonomously slow the truck using the transmission, engine

brake, and service brake. Detroit Assurance 4.0 can fully brake for stationary objects in the truck's path. It can also autonomously engage in the brakes when a pedestrian moves into the truck's path.

Daimler Trucks has called Detroit Assurance 4.0 "life-saving technology" that could "reduc[e] crashes, reduc[e] injuries, and ultimately save lives." Citing the system's safety features, Daimler Trucks announced in March 2018 that Detroit Assurance 4.0 would be a standard feature on all new Cascadia truck models going forward. But since that time, it has still allowed customers to opt out of including this feature. Opting out lowers the vehicle costs, though the specific amount of this reduction is unclear. While Daimler Trucks has attributed a sticker price of $4,324 to Detroit Assurance 4.0, record evidence suggests that it actually has charged half that—"2,000 plus," in one witness's telling. Whatever the price, the charge is a small fraction of a Cascadia's base price.

III

*Lupe Ortiz's Death*

A truck dealership ordered a new Cascadia in January 2018. While aware of Detroit Assurance 4.0, it did not include this feature in its purchase. Daimler Trucks built the truck in August 2018 without Detroit Assurance 4.0, consistent with the dealership's order, and delivered it that same month. The dealership later sold the truck to Shaheen Transport LLC (Shaheen), and Jobanjit Singh then drove it.

Singh and the Cascadia were later involved in a fatal accident. In June 2020, Lupe Ortiz and her passenger were stopped or near stopped at a red light on State Route 99. Coming from behind, Singh drove the Cascadia into the rear end of Ortiz's car at over 55 miles per hour. Both Ortiz and her passenger were killed in the collision. According to two experts, the Cascadia would not have struck and killed Ortiz and her partner had it been equipped with Detroit Assurance 4.0. They reasoned that Detroit Assurance 4.0 can warn the driver about collision risks and automatically brake when the driver fails to act,

6

particularly under the conditions present here—on a straight highway with clear visibility and a long stretch to stop.

## IV

### *Procedural History*

Following Ortiz's death, three of her children (plaintiffs) sued Daimler Trucks, Singh, Shaheen, and several others. As to Daimler Trucks, plaintiffs alleged two claims relevant to this appeal. They alleged that Daimler Trucks was liable for Ortiz's death under a strict products liability theory, in part because it sold the Cascadia here without Detroit Assurance 4.0. They also alleged that Daimler Trucks was liable for Ortiz's death under a negligence theory for similar reasons, asserting that it negligently designed the Cascadia.

Daimler Trucks moved for summary judgment or, alternatively, summary adjudication on these two claims. It argued that both claims failed because it did not cause the collision; Singh instead caused the collision. It also asserted that these claims failed because the Cascadia was not defective. Relevant here, it argued that the Cascadia was not defective, because it did not cause the accident. Lastly, it argued that plaintiffs' claims failed because it had no duty to prevent or mitigate the collision.

Over plaintiffs' objection, the trial court granted Daimler Truck's motion. It said that an attentive driver could have driven the truck safely and avoided the accident even without Detroit Assurance 4.0. It then found, as a matter of law, that plaintiffs could neither establish that the allegedly defective design proximately caused the fatal accident nor that Daimler Trucks owed any applicable duty of care. In the court's words, no triable issue of material fact exists "as to whether Daimler had a legal duty to the Ortiz Plaintiffs, or that the alleged negligence, failure to warn or design of the subject truck were the proximate cause of the Ortiz Plaintiffs' claimed injuries and damages." It afterward entered judgment against plaintiffs. Plaintiffs timely appealed.

DISCUSSION

I

*Standard of Review*

A trial court may grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To make this showing, a moving defendant must show either that one or more elements of the plaintiff's causes of action cannot be established or that there is a complete defense to the plaintiff's case. (*Id.*, subd. (p)(2).) If the defendant meets this initial burden, the burden then shifts to the plaintiff to show that at least one triable issue of material fact exists. (*Ibid.*) On appellate review, we review the trial court's decision de novo. We also " 'liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.)

II

*Strict Products Liability Claim*

We begin with plaintiffs' strict products liability claim. The trial court, again, believed this claim failed as a matter of law for two reasons. It concluded that the lack of Detroit Assurance 4.0 did not proximately cause Ortiz's death, because Singh could have safely operated the truck and stopped without this technology. It also concluded that Daimler Trucks owed no legal duty that would allow plaintiffs' claim to proceed. We reject both conclusions.

A.     *Proximate Cause*

We first address proximate cause and the strict products liability doctrine more generally.

8

### 1. *Strict Products Liability Doctrine*

Under the doctrine of strict products liability, a manufacturer is strictly liable " 'if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way.' " (*Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 30 (*Kim*).) Our Supreme Court has described two alternative tests for establishing a design effect. "First, under the so-called consumer expectations test, a design is defective 'if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.' " (*Ibid.*) "Second, under the risk-benefit test . . ., a design is defective 'if through hindsight the jury determines that the product's design embodies "excessive preventable danger," or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design.' " (*Ibid.*)

Our focus here is on the risk-benefit test, which is the theory plaintiffs rely on. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567 (*Soule*) [the risk-benefit test is better for cases involving "technical issues of feasibility, cost, practicality, risk, and benefit," while "the consumer expectations test is reserved for cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design*"].) Under the risk-benefit test, the plaintiff must first " 'demonstrate[] that the product's design proximately caused his injury.' " (*Kim*, *supra*, 6 Cal.5th at p. 30.) "If the plaintiff makes this initial showing, the defendant must then 'establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.' " (*Ibid.*) We will cover later some of the factors that are relevant in evaluating whether a design's benefits outweigh its inherent risks. But for now, we focus on a plaintiffs' initial burden to show that the product's design proximately caused the alleged injury.

### 2. *Proximate Cause Principles*

Proximate cause is often said to focus on two things: the "cause in fact" of the injury and "policy considerations." (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 315-316.) " 'An act is a cause in fact if it is a necessary antecedent of an event' "—which "has traditionally been expressed as the ' "but for" ' test, i.e., if the injury 'would have happened anyway, whether the defendant was negligent or not, then his or her negligence was not a cause in fact.' " (*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 298.) But even when an act is a cause in fact of an injury, policy considerations may serve to limit liability where it would be considered unjust to impose legal responsibility. (6 Witkin, Summary of Cal. Law (11th ed. 2024) Torts, § 1335; see *State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 353.)[3]

A central consideration in evaluating proximate cause is foreseeability. (*People v. Carney* (2023) 14 Cal.5th 1130, 1139 ["The limitation on liability under the second component of proximate cause comes down to the question of foreseeability"].) That is particularly true in cases involving a third party's intervening conduct. Courts have found that unforeseeable intervening acts can sever the causal chain in some cases. (*California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1097.) But courts have found otherwise when the intervening act is foreseeable. As case law has long explained, "the intervening act of a third person does not relieve the original wrongdoer of liability if the intervening act was a reasonably foreseeable result of the original actor's wrongdoing." (*Davis v. Erickson* (1960) 53 Cal.2d 860, 863.) In that

---

[3] Although our Supreme Court has said "[p]roximate cause involves *two* elements," one of which is cause in fact (*PPG Industries, Inc. v. Transamerica Ins. Co.*, *supra*, 20 Cal.4th at p. 315), it has also described cause in fact as distinct from proximate cause (*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.*, *supra*, 61 Cal.4th at p. 298).

case, both the original wrongdoer and the intervening actor may be deemed a proximate cause of an injury.  (*Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1067 ["A single injury can have more than one proximate cause"].)

Proximate cause—including the inquiry into foreseeability—is ordinarily a question of fact for the jury.  (*State Dept. of State Hospitals v. Superior Court*, *supra*, 61 Cal.4th at p. 353 [proximate cause]; *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57 (*Bigbee*) [foreseeability].)  It may be decided as a question of law only if, under the undisputed facts, there is no room for reasonable minds to differ.  (*State Dept. of State Hospitals*, at p. 353.)

Several cases have explored these principles in the design defect context.  We highlight three, starting with *Camacho v. JLG Industries Inc.* (2023) 93 Cal.App.5th 809.  The plaintiff there "neglected to latch a chain across the entrance of a . . . scissor lift" and "then fell out of the lift's entrance" from a height of about 12 feet.  (*Id.* at pp. 814, 819.)  The plaintiff later sued the lift's manufacturer, alleging "the scissor lift as designed with the chain invited human error, and the foreseeable risk of harm could have been avoided if [the manufacturer] had marketed only its alternative design with a self-closing gate."  (*Id.* at p. 813.)  Considering these facts, the trial court found a lack of causation as a matter of law.  (*Id.* at p. 820.)  But the Court of Appeal reversed.  It acknowledged that the plaintiff could have latched the chain across the entrance and so safely used the lift even without a self-closing gate.  (*Id.* at pp. 819, 822.)  But it still found causation remained a question of fact for the jury, noting, among other evidence, expert testimony that " 'it's very foreseeable' workers will neglect to latch the chain" and evidence about the availability of the alternative design with a self-closing gate that would have prevented the fall.  (*Id.* at pp. 820-825.)

*Bates v. John Deere Co.* (1983) 148 Cal.App.3d 40 is similar.  In that case, an operator of a cotton picker—which had rotating drums that stripped cotton balls from cotton plants—noticed that a rock had clogged one of the drums.  (*Id.* at pp. 44-45.)

11

Although "aware that he should shut off the machine before attempting to dislodge the rock," the operator attempted to kick the rock out without turning the machine off. (*Id.* at pp. 49-50.) After he removed the rock, but before he could remove his foot, the drum began rotating once more and seriously injured him. (*Id.* at p. 45.) He later sued the cotton picker manufacturer, arguing that the machine "was negligently and defectively designed because it failed to have an emergency cutoff switch located in the area of the picking heads within reach of someone caught in the machine." (*Ibid.*) Attacking this claim on causation grounds, the manufacturer asserted that the operator could not, as a matter of law, show that the cotton picker's design proximately caused his injuries. (*Id.* at p. 50.) But the Court of Appeal found otherwise. While it acknowledged that the "evidence supports the conclusion that plaintiff was decidedly careless in acting as he did," it still found that the manufacturer—which could have foreseen this type of misuse—could be found to have proximately caused the operator's injury. (*Ibid*.)

*Bigbee* is our last example. An intoxicated driver in that case veered off a road and slammed into a public telephone booth, severely injuring the plaintiff inside. (*Bigbee*, *supra*, 34 Cal.3d at p. 52.) The plaintiff afterward sued several parties, including the manufacturer of the telephone booth. (*Ibid.*) He alleged among other things that a defect, negligent installation, or negligent maintenance caused the phone booth's door to jam; and had it not jammed, he would have been able to escape in time to avoid injury. (*Id.* at pp. 52-53.) Moving for summary judgment, the defendants contended the driver's unforeseeable conduct constituted a " 'superseding cause' "[4] and, "[t]herefore, no act or omission of theirs could be found to be a proximate cause of those

---

[4]  A "superseding cause, one that breaks the chain of proximate causation, is a 'later cause of independent origin' that was neither 'foreseeable by the defendant' nor 'caused injury of a type which was foreseeable.' " (*California Medical Assn. v. Aetna Health of California Inc.*, *supra*, 14 Cal.5th at p. 1097.)

injuries." (*Bigbee*, at pp. 53-54.)  The trial court agreed.  (*Id.* at p. 55.)  But our Supreme Court did not.  It concluded that the foreseeability of these events—which involved a driver veering off the road, crashing into a nearby phone booth that is difficult to exit, and injuring a person inside—remained a question of fact for the jury.  (*Id.* at pp. 55-56.)  The court added that under these circumstances, "[i]t is of no consequence that the harm to plaintiff came about through the negligent or reckless acts of [the driver]."  (*Id.* at p. 58.)

        3.     *Analysis*

Considering these authorities, we reject the trial court's finding that the truck's allegedly defective design, in omitting Detroit Assurance 4.0, did not proximately cause Ortiz's death as a matter of law.  Plaintiffs' evidence supports the conclusion that it is reasonably foreseeable that some truck drivers—whether because of negligence or other reasons—will rear-end cars on the road after failing to timely brake.  (See *Soule*, *supra*, 8 Cal.4th at p. 560 ["traffic accidents are foreseeable"].)  Daimler Trucks in fact designed Detroit Assurance 4.0 precisely to avoid and mitigate these types of foreseeable collisions.  Plaintiffs' evidence further supports the conclusion that this technology was available at a relatively low cost—and indeed was a standard feature for Cascadias— when Daimler Trucks manufactured the truck here.  And their evidence also supports the conclusion that had Daimler Trucks included Detroit Assistance 4.0 in the truck here, the accident that killed Ortiz would not have occurred.

Under plaintiffs' evidence, then, a reasonable juror could find that Ortiz died because Daimler Trucks omitted an available safety feature designed to prevent this very type of foreseeable accident.  Those types of facts support a finding of proximate cause. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 121 ["It is particularly appropriate that the jury be allowed to determine the inference to be drawn when the evidence indicates that a safety device, designed to prevent the very injury that occurred, was not present"].)  And while no one disputes that Singh could have driven the truck safely even without Detroit Assurance 4.0, that does not in itself break the causal chain as

13

a matter of law, as *Camacho*, *Bates*, and *Bigbee* demonstrate. (See, e.g., *Bigbee*, *supra*, 34 Cal.3d at p. 58 ["It is of no consequence that the harm to plaintiff came about through the negligent or reckless acts of [the driver]"]; *Camacho v. JLG Industries Inc.*, *supra*, 93 Cal.App.5th at pp. 820-825 [product user's negligence did not break the causal chain as a matter of law]; see also *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 812 ["A person is liable for any injury proximately or substantially caused by his negligent conduct, even if a third person's conduct directly precipitates the injury"].)

Nor does Ortiz's status as a bystander, rather than a product user, undermine plaintiffs' claim. The three cases we highlighted above—*Camacho*, *Bates*, and *Bigbee*— all involved harm to the user of a product, not any bystander. But equitable considerations favor, if anything, entitling bystanders "to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable." (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 586.) That is because consumers and users "have the opportunity to inspect for defects and to limit their purchases to articles manufactured by reputable manufacturers and sold by reputable retailers, whereas the bystander ordinarily has no such opportunities." (*Ibid.*) So it was here. And as our Supreme Court has instructed, "where a driver or passenger of another car is injured due to defects in the manufacture of an automobile and without any fault of their own, they may recover from the manufacturer of the defective automobile." (*Ibid.*) Consistent with these principles and the case law covered above, we decline to find a lack of proximate cause as a matter of law.

Favoring a contrary conclusion, Daimler Trucks relies heavily on *Modisette v. Apple Inc.* (2018) 30 Cal.App.5th 136 (*Modisette*). That case involved a person who drove while using the FaceTime application on his iPhone and then crashed into another car. (*Id.* at p. 139.) Two people in the other car afterward sued Apple Inc. (Apple), alleging that Apple should have implemented a safer iPhone design that would have automatically prevented drivers from using FaceTime while driving at highway speed.

14

(*Id.* at p. 140.)  But the trial court sustained Apple's demurrer, in part because of a lack of causation, and then dismissed the action.  (*Id.* at p. 141.)  In affirming, the Court of Appeal accepted that the plaintiffs' alleged facts sufficiently established that Apple's design of the phone was a cause in fact of their injuries.  (*Id.* at p. 153.)  But it concluded that "the tenuous connection between Apple's conduct and the [plaintiffs'] injuries bar[red] a finding of proximate causation."  (*Id.* at p. 152.)  It also elsewhere expressed concern about the consequences of holding a company liable merely for producing a product that could distract a driver.  (*Id.* at p. 149.)

Daimler Trucks asserts that *Modisette*'s reasoning applies equally here.  But we find the case readily distinguishable.  *Modisette* involved the interaction between two distinct products:  (1) a car, and (2) a product that could distract a person, namely, a phone.  In finding in favor of Apple, the court evinced a concern about potentially imposing liability on all those who make or sell products capable of distracting drivers— noting, as examples, "a map, a radio, a hot cup of coffee, or makeup."  (*Modisette*, *supra*, 30 Cal.App.5th at pp. 146, 149.)  It also, among other things, cited another case suggesting that under a contrary ruling, " 'no product that would potentially distract a driver could be marketed.' "  (*Id.* at p. 149.)  And while the court discussed these concerns in an earlier part of its opinion dealing with the issue of duty, not proximate cause, it later emphasized that these types of considerations—" ' "public policy considerations" ' "—matter both for duty and proximate cause.  (*Id.* at pp. 153-154.)

These concerns that animated the *Modisette* court's decision, however, are not at play here.  This case involves a single product with an alleged design defect—not multiple products that could potentially interact together to create an alleged design defect.  These facts make this case similar to *Camacho* and *Bates*, both of which involved a single product with an alleged design defect, not *Modisette*.  Consistent with these other cases, we decline to find a lack of proximate cause as a matter of law.  We also, following our Supreme Court's admonishment, note that "[i]t is particularly appropriate

15

that the jury be allowed to determine the inference to be drawn when the evidence indicates that a safety device, designed to prevent the very injury that occurred, was not present." (*Campbell v. General Motors Corp.*, *supra*, 32 Cal.3d at p. 121.)

B.      *Duty*

We next address the duty to use due care.  Duty is an element of a negligence claim, and it is something we will address in detail when we discuss plaintiffs' negligence claim below.  (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).)  Daimler Trucks believes duty is also an element of a strict products liability claim, and so, in its view, it is something that plaintiffs must allege and prove to prevail on this claim.  The trial court appeared to agree.  We find otherwise.

"Duty is not an element of a strict products liability claim."  (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1592.)  Several courts have already said as much.  (See, e.g., *Williams v. J-M Manufacturing Company, Inc.* (2024) 102 Cal.App.5th 250, 260 [" 'Unlike a negligence theory of liability, a strict products liability theory does not focus on the defendant's duty to use due care; the defendant's behavior is irrelevant' "]; *Elsheref v. Applied Materials, Inc.* (2014) 223 Cal.App.4th 451, 464.)  So to the extent the trial court believed a legal duty of care is a necessary element of a strict products liability claim, we find this belief mistaken.

Disagreeing, Daimler Trucks asserts that one court, *Romito v. Red Plastic Co.* (1995) 38 Cal.App.4th 59, rejected a "strict product liability claim[] based on the ground of no duty."  That case involved an electrician who, while working on a roof, accidentally fell onto a plastic skylight, broke through, and plummeted to his death.  (*Id.* at p. 63.)  His family afterward sued the skylight manufacturer, alleging it was liable in negligence and strict products liability for having failed to use a product strong enough to bear the weight of a falling person.  (*Ibid.*)  Both the trial court and the Court of Appeal, however, found these claims failed as a matter of law.  (*Id.* at pp. 63-64.)  The Court of Appeal rejected the negligence claim after finding the manufacturer owed no legal duty to protect against

16

this type of unforeseeable and accidental conduct. (*Id.* at p. 69.) It then rejected the strict products liability claim for similar reasons, stating that the manufacturer owed no legal duty to protect against this type of conduct. (*Id.* at p. 70.) But in doing so, the court appeared to use duty as a proxy for causation. It even stated at the start of its analysis of the strict products liability claim that one "prong of the design defect test is causation" and it "involves the same policy considerations that we relied upon to negate a duty of care" for the negligence claim. (*Id.* at p. 69.) So although the court framed the issue in terms of duty, it appeared, at bottom, to focus on causation in rejecting the strict products liability claim.

III

*Negligence Design Claim*

We turn now to plaintiffs' negligent design claim. As with the strict products liability claim, the trial court believed plaintiffs' negligent design claim failed for two reasons: First, because the truck's allegedly defective design did not proximately cause Ortiz's death; and second, because Daimler Trucks owed no applicable duty of care. We reject both conclusions.

A.      *Proximate Cause*

We first briefly address causation. "To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' " (*Brown*, *supra*, 11 Cal.5th at p. 213.) Our analysis on proximate cause follows from our discussion above. Again, although we accept that Singh could have safely operated the truck without Detroit Assurance 4.0, we find this insufficient in itself to negate proximate cause and defeat plaintiffs' negligence claim as a matter of law. We thus reject the trial court's conclusion to the contrary.

B.	*Duty*

We next address the duty to use due care.  Whether a duty exists is a question of law to be resolved by the court.  (*Brown*, *supra*, 11 Cal.5th at p. 213.)  Civil Code section 1714 establishes the general rule on the duty to use care.  In relevant part, it provides:  "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."  (Civ. Code, § 1714, subd. (a).)  "In other words, 'each person has a duty to use ordinary care and "is liable for injuries caused by his failure to exercise reasonable care in the circumstances." ' "  (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).)  This "duty of care extends to all persons within the range of potential danger," including, in the case of a manufacturer, customers and bystanders.  (*Pike v. Frank G. Hough Co.* (1970) 2 Cal.3d 465, 473 (*Pike*).)

Our Supreme Court, however, has explained that courts can create exceptions to this general rule "where 'clearly supported by public policy.' "  (*Cabral*, *supra*, 51 Cal.4th at p. 771.)  Considerations that factor into this analysis include " 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' "  (*Ibid*.)  Courts refer to these considerations as the "*Rowland* factors," after the decision that first described them.  (*Id.* at p. 772; see *Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113.)

Case law emphasizes two important features of the *Rowland* analysis.  First, for the most part, courts evaluate the *Rowland* factors "at a relatively broad level of factual

18

generality." (*Cabral*, *supra*, 51 Cal.4th at p. 772.) So when evaluating foreseeability, for instance, the court's task " 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed.' " (*Ibid.*) Not all *Rowland* factors, however, are evaluated at this same level of generality. Some factors require courts to focus on the specific facts at hand, including when evaluating the certainty that the plaintiff suffered injury.

Second, and relatedly, courts do not consider whether the *Rowland* factors "support an exception to the general duty of reasonable care on the facts of the particular case before [them], but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." (*Cabral*, *supra*, 51 Cal.4th at p. 772.) This focus on the general category of negligent conduct, rather than the specific conduct at issue, preserves the distinction between whether a duty exists—which is a question of law for the court—and whether a duty has been breached—which is typically a question of fact for the jury. (*Ibid.*) As our Supreme Court has cautioned, "[a]n approach that instead focused the duty inquiry on case-specific facts would tend to 'eliminate the role of the jury in negligence cases, transforming the question of whether a defendant breached the duty of care under the facts of a particular case into a legal issue to be decided by the court.' " (*Id.* at p. 773.)

Turning to the case before us, plaintiffs argue that manufacturers have a general duty to install reasonable safety devices. (See *Pike*, *supra*, 2 Cal.3d at p. 474 [negligence law imposes a duty on manufacturers to use due care " 'where *others* are threatened by want of a feasible safety device wherever the foreseeable danger to them is unreasonable' "]; 63A Am.Jur.2d (2025) Products Liability, § 837 ["A manufacturer has the legal duty to adopt reasonable product safety devices in its design of a product"].) Daimler Trucks does not disagree. But citing the *Rowland* factors, it argues that a

categorical exception from this duty should exist for the safety devices involved in this case—that is, collision avoidance systems like forward collision warning and automatic emergency braking. Our task, then, is to resolve whether public policy clearly supports a categorical carveout for these safety devices. With this understanding in mind, we turn to the *Rowland* factors.

### 1. *Foreseeability Factors*

We begin with " 'foreseeability and the related concepts of certainty and the connection between plaintiff and defendant' "—which our Supreme Court has called the foreseeability factors. (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1021 (*Kuciemba*).)

*First*, we find it foreseeable that the driver of a large commercial truck, which lacks a collision avoidance system, could strike another vehicle after failing to timely brake. No one appears to dispute this. Daimler Trucks even acknowledges that "[e]very purchaser, driver and owner of a motor vehicle knows the risks of rear end collisions." It developed Detroit Assistance 4.0, moreover, precisely to avoid and mitigate these types of foreseeable collisions. And speaking of accidents more generally, our Supreme Court has, stating the obvious, called traffic accidents "foreseeable." (*Soule*, *supra*, 8 Cal.4th at p. 560; see also *Bigbee*, *supra*, 34 Cal.3d at p. 58 ["intoxicated drivers" are "to be expected"].)

Of course, as Daimler Trucks notes, drivers should be diligent and capable of avoiding these collisions even without Detroit Assistance 4.0 or similar safety features. And in an ideal world, drivers would always demonstrate these qualities. But in reality, "drivers may be intoxicated, distracted, blinded by the weather or sun, sleepy or sick, and for any of these reasons or others," fail to apply the brakes in time to avoid striking other vehicles. (*Cabral*, *supra*, 51 Cal.4th at p. 775.) Those are all foreseeable circumstances. We are thus satisfied that the facts favor a finding of foreseeability—which our Supreme Court has called "[t]he most important factor to consider in determining whether to create

20

an exception to the general duty to exercise ordinary care articulated by [Civil Code] section 1714." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 (*Kesner*).) Daimler Trucks does not argue otherwise.

*Second*, we find the *Rowland* factor concerning the degree of certainty that the plaintiff suffered injury also weighs in favor of recognizing a duty of care. Plaintiffs' injuries are certain. Their mother "was killed in the accident, for which plaintiff[s] undisputedly ha[ve] a remedy in wrongful death if h[er] death was negligently caused." (*Cabral*, *supra*, 51 Cal.4th at p. 781, fn. 9.) Here too, Daimler Trucks does not argue otherwise.

*Third*, we find the connection between Daimler Trucks' conduct and Ortiz's death sufficiently close to weigh, at least somewhat, in favor of recognizing a duty of care. To start, we acknowledge that Singh's conduct had a closer connection to Ortiz's death. But " '[w]here the third party's intervening conduct is foreseeable . . . , then that conduct does not " 'diminish the closeness of the connection between defendant['s] conduct and plaintiff's injury.' " ' " (*Kuciemba*, *supra*, 14 Cal.5th at p. 1023.) Here, as covered, Singh's intervening conduct—his apparent negligence in failing to timely brake—was foreseeable. And more generally, it is foreseeable that the driver of a commercial truck, which lacks a collision avoidance system, could strike another vehicle after failing to timely brake. The foreseeability of these collisions is why systems like Detroit Assurance 4.0 exist. Under these circumstances, we find this factor weighs in favor of recognizing a duty of care.

Resisting this conclusion, Daimler Trucks argues there is no close connection between its conduct and Ortiz's death. It reasons, quoting *Modisette*, that it "did not 'place[] plaintiffs in a dangerous position [or] create[] a serious risk of harm to which they otherwise would not have been exposed.' " (*Modisette*, *supra*, 30 Cal.App.5th at p. 146.) However, we find that quote inapplicable. Daimler Trucks manufactured and sold a new Cascadia that lacked any collision avoidance system, despite Detroit Assurance 4.0

21

being readily available. It did so knowing this truck would be put on the road. And it consequently placed Ortiz and others in a dangerous position when that truck's driver, Singh, failed to timely brake—which, again, as a general matter, was a reasonably foreseeable event. Singh's conduct, no doubt, had a closer connection to the injuries here. But we find Daimler Trucks' conduct still had a sufficiently close connection to these injuries—and still served to increase the risk of harm—despite Singh's intervening conduct. (See *Shipp v. Western Engineering, Inc.* (2020) 55 Cal.App.5th 476, 483, 499-501 [driver who was "not paying attention" rear-ended a plaintiff stopped on a highway; held, highway contractor's "imprudent[]" conduct that caused the plaintiff to stop was sufficiently connected to the injury to support finding a duty of care].)

Daimler Trucks further argues that too many events had to occur for this accident to happen, making it unreasonable to find a close connection between its conduct and Ortiz's death. It reasons that traffic had to be stopped, Singh had to fail to stop the Cascadia, and the Cascadia then had to collide with Ortiz's car with enough force to cause fatal injuries. But that is a limited chain of events. And as our decision in *Shipp v. Western Engineering, Inc.*, *supra*, 55 Cal.App.5th 476 demonstrates, it is not too attenuated a connection. In that case, a highway contractor's traffic control stop prevented a driver from turning left onto a road. So the driver stopped. A plaintiff got stuck behind the stopped driver. Another driver, who was "not paying attention," then rear-ended the plaintiff. (*Id.* at pp. 482-483.) Despite this chain of causation, we still found the contractor's conduct sufficiently close to the plaintiff's injury to favor finding a duty of care. (*Id.* at pp. 499-501.) We find the same here.

### 2. *Policy Factors*

We turn now to the remaining *Rowland* factors—" 'the public policy concerns of moral blame, preventing future harm, burden, and insurance availability.' " (*Kuciemba*, *supra*, 14 Cal.5th at pp. 1021-1022.)

22

*First*, we find the factor concerning moral blame of limited value at this stage. Comparing Daimler Trucks to Ortiz, Daimler Trucks certainly is the more blameworthy actor. Ortiz had no control over the operation of Singh's truck, nor did she engage in any apparent misconduct. Daimler Trucks, on the other hand, exercised far greater control over the risks here. It knew Detroit Assistance 4.0 could save lives when a Cascadia driver fails to brake in time to avoid an accident. It has even called this system "life-saving technology." But it did not require this technology in the truck here. Comparatively speaking, then, Daimler Trucks is more morally blameworthy—which case law shows to be a relevant consideration. (See *Kesner*, *supra*, 1 Cal.5th at p. 1151 ["We have previously assigned moral blame, and we have relied in part on that blame in finding a duty, in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue"]; *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1091 ["We have said that if there were reasonable ameliorative steps the defendant could have taken, there can be moral blame 'attached to the defendants' failure to take steps to avert the foreseeable harm' "].)

But strictly speaking, we cannot say that Daimler Trucks engaged in particularly morally blameworthy conduct. Or at least we cannot say as much if, as Daimler Trucks urges, we interpret this factor to require "a 'higher degree of moral culpability' such as intentional, reckless, and inherently harmful acts." Several Courts of Appeal have endorsed this interpretation, with all these decisions appearing to derive their understanding of "moral blame" from *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 270. (See, e.g., *Laico v. Chevron U.S.A., Inc.* (2004) 123 Cal.App.4th 649, 666, fn. 4.) We find no hint of this heightened requirement in our Supreme Court's precedent. But assuming this understanding is correct, which plaintiffs do not oppose, we cannot say that Daimler Trucks' conduct should be deemed morally blameworthy. The evidence, as covered, shows that Daimler Trucks did not require Detroit Assistance 4.0 in Cascadias,

23

even though it believed this system could save lives. But it informed buyers about the system's availability and benefits, it made this system standard in Cascadias in March 2018, and, while it still allowed buyers to decline this feature afterward, it did so at a time when federal authorities were still investigating the benefits of this technology. Under these circumstances, we find this factor points neither against nor toward imposition of a duty.

*Second*, we find the policy of preventing future harm weighs in favor of finding a duty of due care. "The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible." (*Cabral*, *supra*, 51 Cal.4th at p. 781.) We find that overall policy advanced in imposing liability on commercial truck manufacturers for the negligent omission of collision avoidance systems. The entire purpose of these safety systems, after all, is to prevent harm. And so holding manufacturers liable for negligent omission of these safety systems advances the policy of preventing future harm.

Favoring a contrary conclusion, Daimler Trucks asserts that NHTSA approves heavy-duty truck manufacturers offering automatic emergency braking systems as optional, rather than required, equipment. (See *Cabral*, *supra*, 51 Cal.4th at pp. 781-782 [policy favoring "imposing the costs of negligent conduct upon those responsible" may be "outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability"].) Daimler Trucks reasons that NHTSA has demonstrated this approval in never requiring heavy-duty trucks to be equipped with these safety features.

But while " 'inaction might indicate legislative approval' " in some circumstances (*People ex rel. Green v. Grewal* (2015) 61 Cal.4th 544, 566), we cannot say that is the case here. To start, before Daimler Trucks built the Cascadia here, NHTSA had already acknowledged that collision avoidance systems "have the potential to save lives by preventing or reducing the severity of rear-end crashes." (Federal Motor Vehicle Safety

24

Standards; Automatic Emergency Braking, 80 Fed.Reg. 62487 (Oct. 16, 2015).) It had also "already taken significant steps to incentivize the installation of these technologies" in light motor vehicles. (Federal Motor Vehicle Safety Standards; Automatic Emergency Braking, 82 Fed.Reg. 8391 (Jan. 25, 2017).) And the NTSB, in a 2017-2018 report, specifically wrote that "[t]hese technologies are available today" and "should be implemented today." Similar considerations led the Arizona Supreme Court to state: "To the extent there is a manifest [NHTSA] policy objective concerning [automatic emergency braking] installation, it is to see [automatic emergency braking] deployed as quickly and as broadly as possible." (*Varela v. FCA US LLC* (2022) 252 Ariz. 451, 466 [rejecting argument that federal law preempts state tort suits claiming that car manufacturers should have installed automatic emergency braking].)

Daimler Trucks objects that NHTSA expressed some hesitation about certain advanced driver assistance systems in 2021. That is true. NHTSA wrote in 2021 that "Level 2" advanced driver assistance systems—which, according to NHTSA, are systems that "provide[] continuous assistance with both acceleration/braking AND steering" (NHTSA, Automated Vehicles for Safety, The Road to Full Automation, Levels of Automation (May 2022) <https://www.nhtsa.gov/sites/nhtsa.gov/files/2022-05/Level-of-Automation-052522-tag.pdf> [as of June 25, 2025], archived at: <https://perma.cc/3VSB-XHHC>), while driver remains fully engaged and attentive—"present safety risks to occupants of those vehicles and other roadway users, in part due to the unconventional division of responsibility between the vehicle and its human driver." NHTSA further noted "potential safety issues with vehicles operating using Level 2 [advanced driver assistance systems] include the design and performance of sensors, software algorithms, and other technology used to analyze and respond to the vehicle's environment; technology and strategies to ensure appropriate driver engagement; and the evolution of the system over time through software updates."

But favoring collision avoidance systems specifically—rather than "Level 2" advanced driver assistance systems more broadly—NHTSA has adopted a new vehicle safety standard to require forward collision warning and automatic emergency braking systems for light vehicles, that is, vehicles with a gross vehicle weight rating of 10,000 pounds or less. (Federal Motor Vehicle Safety Standards; Automatic Emergency Braking Systems for Light Vehicles, 89 Fed.Reg. 39686-39687 (May 9, 2024).) It has also proposed to adopt—though not yet adopted—a new vehicle safety standard to require these systems "on heavy vehicles, i.e., vehicles with a gross vehicle weight rating greater than 4,536 kilograms (10,000 pounds)." (Heavy Vehicle Automatic Emergency Braking; AEB Test Devices, 88 Fed.Reg. 43174, 43179 (July 6, 2023).) So while NHTSA has not yet required forward collision warning and automatic emergency braking systems in new heavy trucks, we cannot say it approves of manufacturers making these safety features optional, as Daimler Trucks claims.

*Third*, turning to the last factor we will address in any detail, we consider the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach. Daimler Trucks maintains that this factor weighs heavily in its favor. It argues that the consequences of finding a duty here would be sweeping, with all manufacturers needing to install, and all purchasers needing to buy, "novel technologies." It adds that "[i]nnovation would be chilled, inhibiting research and development of new products and technologies."

Daimler Trucks, however, overstates its case. Again, no one disputes that manufacturers have a general duty to install reasonable safety devices. The parties only dispute whether public policy clearly supports a departure from this duty for collision avoidance systems. Daimler Trucks maintains the answer must be yes, alleging that a contrary finding would have sweeping adverse consequences. But retaining a duty of due care in this context would not mean that commercial truck manufacturers must install collision avoidance systems in all new trucks. Nor would it mean more broadly, as

Daimler Trucks fears, that manufacturers will be found liable for failing to install novel safety devices that may not be particularly effective, practical, or cost-effective. It would instead mean only that manufacturers must exercise due care when choosing whether to install collision avoidance systems. That is not the drastic duty that Daimler Trucks fears.

Still, we acknowledge that finding a duty here may put some pressure on manufacturers to install reasonable safety devices, along with some safety devices that they may fear a jury could find reasonable. But negligence law (and tort law generally) has long put pressure on manufacturers to install reasonable safety devices. The tort system, after all, serves in part "to ensure that those 'best situated' to prevent . . . injuries are incentivized to do so." (*Kesner*, *supra*, 1 Cal.5th at p. 1153; see also *Nelson v. Superior Court* (2006) 144 Cal.App.4th 689, 696 [strict products liability law serves in part " ' "to provide an economic incentive for improved product safety" ' "].) That is typically regarded as a good thing. And we will not, as Daimler Trucks has, equate an incentive to install reasonable safety devices with a command to install all safety devices.

Nor will we put too much stock into Daimler Trucks' claim, at the summary judgment stage, that collision avoidance systems like Detroit Assurance 4.0 are too novel. To start, plaintiffs dispute that factual allegation, putting forth evidence that Daimler Trucks has offered some type of collision avoidance system since 2009. They also supplied evidence showing that Daimler Trucks offered its first iteration of Detroit Assurance in 2015—years before it built the truck here. So Daimler Trucks' characterization of this technology as too novel is subject to dispute. And while we accept that collision avoidance systems might be deemed novel at one point in time, they might also be found practical, relatively inexpensive, and effective at saving lives at another point in time. The same perhaps may be said of many safety features now deemed the norm, including lap-and-shoulder seatbelts (which federal authorities once thought "might negatively impact child safety" (*Williamson v. Mazda Motor of America,*

27

*Inc.* (2011) 562 U.S. 323, 333)) and airbags (which courts once called a " 'new technology' " (*Bresnahan v. Chrysler Corp.* (1995) 32 Cal.App.4th 1559, 1566)).  In the end, we accept that recognizing a duty here will burden Daimler Trucks and other commercial truck manufacturers to a degree, but we find far less of a burden than Daimler Trucks imagines.[5]

### 3. Rowland *Factors Considered Together*

Considering the *Rowland* factors together, we cannot say that public policy clearly supports a categorical no-duty rule in these circumstances.  As covered, we find most of the *Rowland* factors—including foreseeability, certainty of injury, the connection between Daimler Trucks' conduct and plaintiffs' injuries, and the policy of preventing future harm—lean in favor of recognizing a duty of care.  And while we accept that recognizing a duty of care here would burden Daimler Trucks and similar manufacturers to a degree, we are not persuaded that this burden—considered alongside the other *Rowland* factors—warrants a categorical no-duty rule here.

We emphasize that in reaching this decision, we are evaluating a general duty that sweeps broader than the specific facts before us.  Daimler Trucks tends to focus on the particulars of this case when arguing that we should find no duty.  But accepting its position would have broad implications.  Under its position, for instance, a commercial truck manufacturer would have no duty to install collision avoidance systems even if those systems were undeniably practical, relatively inexpensive, and effective at preventing accidents and saving lives.  But we cannot say that is a result " 'clearly supported by public policy.' " (*Cabral*, *supra*, 51 Cal.4th at p. 781.)  So we will retain the default rule of duty, which our Supreme Court, long ago, said requires manufacturers

---

[5] The last factor discussed in *Rowland* concerns the availability, cost, or prevalence of insurance in this context.  But because neither party discusses this factor, we exclude it from our analysis.

to use due care " 'where [third parties] are threatened by want of a feasible safety device wherever the foreseeable danger to them is unreasonable.' " (*Pike*, *supra*, 2 Cal.3d at p. 474.)  We find no persuasive reason to carve out an entire category of safety devices— collision avoidance systems—from this general duty.

None of this is to say, of course, that Daimler Trucks breached its duty here. Daimler Trucks often fails to appreciate the difference between duty and breach, stating, for instance, that finding a duty here would mean that "[a]ll heavy-duty trucks would effectively be deemed defective for not having" collision avoidance systems.  But that is simply not the case.  A court could very well find manufacturers have a duty to use due care when choosing whether to install a certain safety device—yet a jury could then, after accounting for case-specific facts, find the manufacturer before it did not breach this duty when deciding to omit this safety device.  As this case proceeds, Daimler Trucks no doubt will argue that it did not breach its duty here, in part perhaps on the ground that at the time of the accident, Detroit Assurance 4.0 remained a relatively new technology with potential shortcomings.  But that is not the issue before us.  And focusing on the issue of duty, we reject Daimler Trucks' claim that the *Rowland* factors favor a categorical no-duty rule here.  (See *Kesner*, *supra*, 1 Cal.5th at p. 1149 ["Where there *is* a logical causal connection between the defendant's negligent conduct and the intervening negligence of a third party driver, making the intervening negligence foreseeable, we have found both a duty and liability"].)[6]

---

[6] Our conclusion on duty, in some respects, reinforces our earlier conclusion on proximate cause.  Under our duty analysis, commercial truck manufacturers owe third-party drivers a duty to use due care when choosing whether to install collision avoidance systems.  But if this duty is to mean anything, then Daimler Trucks' claim that proximate cause is lacking as a matter of law cannot be right.  Otherwise, manufacturers would owe third-party drivers a duty that would apparently amount to nothing.  For even if these drivers showed a breach of the applicable duty and suffered injury because of this breach,

## IV

### *Daimler Trucks' Remaining Arguments*

Daimler Trucks offers several additional arguments that, in its view, show that plaintiffs' claims fail as a matter of law. We find none persuasive.

A.     *Optional Safety Features*

First, Daimler Trucks contends causation—and in particular, cause-in-fact causation—is lacking. It notes that Shaheen and the dealership that sold Shaheen the truck here repeatedly ordered Cascadias without Detroit Assurance 4.0, both before and after the accident in this case. It then argues that it is "complete speculation" to conclude that they would have acquired the truck here had Daimler Trucks required the inclusion of this technology; they might instead have fulfilled their truck needs from a different manufacturer. Daimler Trucks raised the same type of argument in its motion for summary judgment, though the trial court never addressed it. We reject the argument.

Plaintiffs' claim is not, as Daimler Trucks asserts, based on "complete speculation." The evidence, again, shows that the dealership and Shaheen repeatedly ordered Cascadias. The evidence shows too that while adding Detroit Assurance 4.0 to these trucks would have increased costs, the cost increase per truck was relatively low. And nothing in the record, as far as Daimler Trucks has cited, shows that any other manufacturer's trucks would have met the dealership's and Shaheen's needs, let alone that it would have met these needs at a lower cost. On this record, a trier of fact could reasonably infer that the dealership and Shaheen still would have purchased the truck here even had Daimler Trucks required the inclusion of Detroit Assurance 4.0. And while we acknowledge that imagining the dealership's and Shaheen's conduct under an alternative past can be difficult, that is nothing unusual when evaluating causation.

---

they still would never be able to show proximate cause under Daimler Trucks' position— which would treat the offending driver as the sole proximate cause in every case.

30

"Determining causation always requires evaluation of hypothetical situations concerning what might have happened, but did not." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1242.)

Daimler Trucks' position, moreover, is founded on its own speculation. Daimler Trucks speculates that the dealership and Shaheen might not have purchased the truck here had Detroit Assurance 4.0 been included. But a moving party is not entitled summary judgment based on mere speculation. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 864 [speculation is not evidence].) And were we to nonetheless endorse Daimler Trucks' position, we would be providing a roadmap for manufacturers to evade liability for defective products. A manufacturer would just need to offer, along with its defective product, a non-defective product as an upgrade option. And then when the consumer or some third party is harmed by the defective product, the manufacturer could claim a lack of causation. To use Daimler Trucks' reasoning, the manufacturer could say it is "complete speculation" to conclude that the consumer would have acquired the product had the manufacturer offered only the non-defective option. We reject this effort to eviscerate products liability law.

B.      *Breach of Contract*

Next, Daimler Trucks suggests that plaintiffs' claims fail as a matter of law because it could not have installed Detroit Assurance 4.0 on the truck here. It reasons that it was contractually obligated to provide this truck without Detroit Assurance 4.0 and so would have breached the purchase contract had it nonetheless installed this technology. Daimler Trucks raised this argument in a single sentence in its motion for summary judgment, which the trial court never addressed. We reject this argument too.

Daimler Trucks' argument is odd. It suggests that when a manufacturer offers a defective product, and a customer orders that product, the manufacturer is obligated to provide the defective product—otherwise, the manufacturer would breach the purchase contract. And then when a third party is injured by the defective product, the manufacturer can point to the purchase contract as a complete defense. But that logic, if

31

accepted, would allow manufacturers to evade liability for defective products altogether. We reject this effort to gut products liability law. To the extent a manufacturer enters a contract to sell a defective product, it cannot use that contract as a shield when the defective product then harms a third party, "for one purpose of strict liability in tort is to prevent a manufacturer from defining the scope of [its] responsibility for harm caused by [its] products." (*Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 17.)

C.     *Design Defect*

Lastly, Daimler Trucks contends it is entitled to summary judgment because the truck was not defectively designed under the risk-benefit test. Again, to show a product is not defective under that test, a defendant must " 'establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.' " (*Kim*, *supra*, 6 Cal.5th at p. 30.) Relevant factors include " 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.' " (*Ibid.*) Daimler Trucks maintains that under these factors, the truck's design should be deemed not defective as a matter of law.

We find it unnecessary, however, to engage with Daimler Trucks' argument. In its motion for summary judgment, Daimler Trucks asserted, as here, that the truck was not defectively designed under the risk-benefit test. But its reasoning turned solely on causation. It argued that the Cascadia was not defective under this test, because "the design of the Cascadia did not cause plaintiffs' injuries or damages"—a misguided argument that wrongly equated an absence of causation with an absence of a defect. So although Daimler Trucks claimed the Cascadia was not defective at the trial level, it never showed that to be true in its motion for summary judgment. As plaintiffs wrote in opposition to Daimler Trucks' motion, the "motion says *nothing* on that issue" and so

32

Daimler Trucks failed to meet its burden under the risk-benefit test. For this reason, we decline to consider Daimler Trucks' belated attempt to meet its burden on appeal. (*Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 686 [declining to reach issue "not raised by defendants in their motion for summary judgment"].)[7]

Nor will we address Daimler Truck's suggestion that when a customer decides to purchase a product without an optional safety feature, the manufacturer cannot be held liable for any injuries that the safety feature may have prevented—another argument that Daimler Trucks never presented in its motion for summary judgment. Daimler Trucks cites one case, *Austin v. Clark Equipment Co.* (4th Cir. 1995) 48 F.3d 833, endorsing this reasoning after applying Virginia law. That court believed it " 'axiomatic' " that the manufacturer should not be held liable under these circumstances (*id.* at p. 837; see *id.* at p. 836 [applying Virginia law]). But as plaintiffs note, one California decision appears inconsistent with this conclusion. In *Widson v. International Harvester Co.* (1984) 153 Cal.App.3d 45, the court generally approved a jury instruction stating: " 'A product *is* defective if it is delivered without a safety device which is reasonably necessary to its foreseeable use, *even if the safety device was offered as optional equipment*.' " (*Id.* at p. 53, second italics added.)

---

[7] Perhaps because of Daimler Trucks' limited briefing, the trial court never addressed whether the truck was defective under the risk-benefit test. And while Daimler Trucks claims the court did resolve this issue in its favor, we think it misreads the record. Favoring Daimler Trucks, the court concluded that the truck was not defective under the consumer expectations test. It wrote: "[T]he truck was no more dangerous than an ordinary consumer would consider it to be and the absence of a collision mitigation system did not render the truck unreasonably dangerous or defective." But it never went on to find the truck not defective under the risk-benefit test—which was the theory plaintiffs advanced.

Courts in several other jurisdictions have found similarly.  (See, e.g., *Bilotta v. Kelley Co., Inc.* (Minn. 1984) 346 N.W.2d 616, 624 [rejecting "a defense [that] would permit an entire industry to market unreasonably dangerous 'stripped down' devices and offer as optional all safety devices"]; *Caterpillar Tractor Co. v. Ford* (Ala. 1981) 406 So.2d 854, 857 ["If the tractor was defective in the condition in which it was sold, liability for resulting injury cannot be escaped by showing that the customer could have but did not buy an item which would have removed the defect"].)  So too has a prominent treatise on products liability.  (1 Owen & Davis on Products Liability (4th ed. 2024) Optional safety devices, § 8:23 ["even if the manufacturer were to offer such a feature as optional equipment, a court normally would conclude that a product sold without such a feasible, safety-enhancing, inexpensive safety feature renders the product defective and the manufacturer negligent for failing to equip the product with the feature as a standard part of the design" (fn. omitted)].)  We need not resolve this issue here, however.  Because Daimler Trucks failed to raise this issue in its summary judgment motion, we decline to address it for the first time on appeal.  (*Good Government Group of Seal Beach, Inc. v. Superior Court*, *supra*, 22 Cal.3d at p. 686.)

## DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings. Plaintiffs are entitled to recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)

/s/
BOULWARE EURIE, J.

We concur:


/s/
EARL, P. J.


/s/
DUARTE, J.

34